[Crim. No. 126.   Third Appellate District.—June 13, 1910.]

## THE PEOPLE, Respondent, v. RAFAELE PETRUZO, Appellant.

CRIMINAL LAW—MURDER—SUPPORT OF VERDICT.—*Held,* that the evidence is clear and convincing that the defendant charged with murder was justly convicted of murder in the first degree; that the defendant may consider himself fortunate that the jury fixed the penalty at life imprisonment, instead of leaving the severer penalty to be imposed by the court; that there is no pretense of excuse or justification for the homicide; and that the case for the people rested upon the dying declaration of the deceased, the testimony of eye-witnesses to the shooting, and the defendant's attempt to escape from jail after his arrest.

ID.—DYING DECLARATION OF AUSTRIAN—INTERPRETER—TRANSLATION BEFORE SIGNATURE—HEARING IN ENGLISH UNDERSTOOD—ADMISSION.—Where the dying declaration of the deceased was first given in the Austrian language to an interpreter, and it was formally written down in English, and read to and understood by him before signing it, and he had first been informed by the attending physician that he would die, and the declaration stated that it was made in fear of death, and believing that he was about to die, and stated the details of the shooting by defendant and his companion, and no objection was made thereto, it was properly admitted.

ID.—TESTIMONY OF PHYSICIAN—CERTAINTY OF DEATH—OPINION—POINTING OUT SHOOTING PARTIES.—Where the attending physician, before the dying declaration was admitted, testified that he told deceased, through another party, that he would die, and when his opinion was asked as to his living or dying at that time, stated, over objection, that when he so told the deceased, his opinion was that he would certainly die, the answer was without prejudice. He further testified that when defendant and his companion were brought before deceased he pointed them out as the parties who did the shooting.

ID.—CROSS-EXAMINATION OF PHYSICIAN—SPEAKING THROUGH INTERPRETER—INCOMPETENT HEARSAY.—Where the physician testified on cross-examination that all he had to do with the defendant was done through the interpreter, and the interpreter only spoke to him, his testimony as to what the interpreter said to him was incompetent hearsay.

ID.—SETTLED RULE—INCOMPETENT EVIDENCE—NECESSARY TRANSLATION. It is a well-settled rule that a witness is incompetent to testify to a declaration made by a party when it is necessary to have it translated before it can be understood by the witness. Such testimony

is clearly hearsay, as the witness necessarily testifies to what the interpreter declares the other party said.

ID.—WAIVER OF OBJECTION—MOTION TO STRIKE OUT.—Where no objection was taken to the original evidence of the physician that he informed the deceased through another party that he could not live, objection to such evidence is waived and cannot be urged for the first time on motion to strike it out.

ID.—TENABLE TESTIMONY AS TO POINTING OUT PARTIES—SUBSTANCE OF DYING DECLARATION—EVIDENCE AS TO USE OF ENGLISH.—The testimony as to the pointing out by the deceased of the parties who shot him,. when brought before him, was tenable as proving by ocular demonstration the substance of his dying declaration. Other witnesses further testified that he identified them in the use of the English language.

ID.—FIRING OF FATAL SHOT—DISAGREEMENT OF WITNESSES IMMATERIAL —AIDING AND ABETTING.—It is immaterial that all the witnesses did not agree that defendant alone fired the fatal shot, since, whether he did so or only aided and abetted in the consummation of the crime, there was ample evidence, on either theory, to justify the conviction of the defendant.

ID.—DISTRICT ATTORNEY NOT BOUND TO ELECT—PROVINCE OF JURY.— The district attorney was not required to elect one or the other of these positions on which to base his claim for a verdict. His duty was done when he presented the evidence; and it was for the jury, under proper instructions, to follow the witnesses whose testimony carried conviction. In such case, the witnesses testified to only one transaction and one offense, and under the law he was a principal, and could be convicted of murder under either contingency.

ID.—DECLARATION ABOUT SHOOTING DAY AFTER HOMICIDE.—PART OF RES GESTAE.—While it is true that the facts, circumstances or declarations which grow out of the principal fact and serve to illustrate, qualify or explain it constitutes the *res gestae,* still that term is not so comprehensive as to include declarations made on the day following the homicide and many hours thereafter, as to what was then said about the shooting which took place the night before.

ID.—INSTRUCTION AS TO AIDING AND ABETTING "UNLAWFUL ACT."—An instruction that if the jury "believes, upon the evidence, to a moral certainty and beyond a reasonable doubt that defendant was present aiding and abetting in the commission of an unlawful act, and that in the commission of said unlawful act deceased was killed, it will be your duty to bring in a verdict of guilty of murder in the first degree," was abstractly erroneous; but where the only "unlawful act" proved is the deliberate attempt to take the life of the deceased, unless there be some evidence of an attempt to commit robbery, the instruction is obviously without prejudice.

ID.—INSTRUCTION ABSTRACTLY ERRONEOUS NOT ERRONEOUS IN FACT.— An instruction may be abstractly erroneous as a general proposition

and yet not erroneous when considered in connection with the particular case and the facts to which it relates.

ID.—INSTRUCTION OF COURT AS TO "UNLAWFUL ACT"—AIDING AND ABETTING MURDER.—That the court intended by the words "aiding and abetting an unlawful act," to refer to the act of murder, is shown by an instruction given at defendant's request, that "it must be proved to a moral certainty and beyond all reasonable doubt that the person charged as an aider and abetter of his malice aforethought was present, aiding and abetting his principal in the act of taking the life of the deceased," and that otherwise "you cannot convict him of murder."

ID.—INSTRUCTIONS AS TO "MOTIVE."—The court did not err in an instruction that if the jury were satisfied beyond a reasonable doubt that the crime of murder has been committed and that defendant is guilty thereof, "then the motive for its commission is unimportant and not material." But that the court did not minimize "motive" appears from another instruction that the absence of motive "is a circumstance in favor of innocence," and that when there is "reasonable doubt as to who committed it, affords a strong presumption of innocence."

ID.—INSTRUCTION AS TO ATTEMPT TO ESCAPE NOT PREJUDICIAL.—Where there was evidence that after the arrest of the defendant, while he was in the county jail, he attempted to escape, an instruction to the jury that if they found this to be true from the evidence, "that fact alone is not evidence of guilt, but it is a circumstance that the jury may well consider in determining the guilt or innocence of the defendant," is not prejudicial to the defendant from the use of the word "well," but it is more favorable to defendant than he would expect, in declaring that the attempt to escape, "of itself, is not evidence of guilt," but of this defendant appealing cannot complain.

ID.—INSTRUCTION AS TO GUILT FOLLOWING INTENTION TO KILL NOT PREJUDICIALLY MISLEADING.—An instruction that "every person is presumed to intend what his acts indicate his intention to have been, and if you find from the evidence beyond a reasonable doubt that defendant fired a loaded pistol at the deceased and killed him, the law presumes that defendant intended to kill the deceased, and unless it is shown by the evidence that his intention was other than his acts indicated, the law will not hold him guiltless," though it was error to instruct the jury that guilt would follow from such intention, yet, in view of the facts and circumstances of the case, and the other instructions, the jury could not have been misled or prejudiced by the instruction.

ID.—REQUEST PROPERLY REFUSED—ABSENCE OF CONSPIRACY—DOUBT AS TO FIRING FATAL SHOT—OMISSION OF AIDING AND ABETTING.—A requested instruction by defendant that "if a person is killed by a bullet fired from a pistol, and two persons each at the same time

fire loaded pistols at him, and one of the persons is on trial and there is no conspiracy proved between the two persons who fired, and the jury are in doubt as to which shot killed the deceased, the defendant is entitled to the benefit of that doubt, and should be acquitted," was properly refused as precluding the jury from considering the theory that the defendant was an aider and abetter, although there might be no conspiracy between them.

ID.—REQUESTS COVERED BY CHARGE.—It was not error to refuse requested instructions, where the principles embodied therein, so far as correct, were covered by the instructions given by the court in its charge.

APPEAL from a judgment of the Superior Court of Plumas County, and from an order denying a new trial. J. O. Moncur, Judge.

The facts are stated in the opinion of the court.

L. N. Peter, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

BURNETT, J.—The evidence is clear and convincing that defendant was justly convicted of murder in the first degree. Indeed, he may consider himself fortunate that the jury fixed the punishment at life imprisonment instead of leaving the severer penalty to be imposed by the court. There is no pretense of excuse or justification for the homicide, and the showing in behalf of defendant was meager and inconsequential, directed to the contention that he was somewhat under the influence of liquor, together with certain circumstances related by two or three witnesses tending to create a suspicion that a party not arrested may have committed the crime. The defendant did not take the witness-stand, and, as far as the record shows, offered no explanation of the affair and made no denial of the charge, except what is implied in his plea of "not guilty."

The case for the people rested upon the dying declaration of the deceased, the testimony of eye-witnesses to the shooting, and the defendant's attempt to escape from jail after his arrest.

The tragedy occurred after dark on a mountainous trail on the north fork of Feather river,. while a party of seven Italians, including appellant, and a party of five Austrians, including the deceased, were returning to their respective camps from a Sunday afternoon visit to a saloon about two miles from the line of the Western Pacific railroad, then in course of construction. The deceased, one Sam Radich, and another member of the Austrian party, named Peter Sunajko, were shot at the same time and both died the following day.

The said dying declaration was in writing, signed by the deceased, and in the following language: "Long Bar, California, 30th, 1908. Being in the fear of death and believing I am about to die, I make the following statement: That I was shot at by De Carlo Antonino and Raphael Petruzo and hit in the abdomen by a bullet from a revolver. This occurred at a point on the river trail near Long Bar, Plumas county, California, on November 29th, 1908, about 6:60 p. m., Peter Sunajko was coming to my assistance and was shot in the back."

The members of the said Austrian party related, in somewhat broken English, the incidents of the homicide, from which it appears that they passed the party of Italians on the trail, greeting the latter in a friendly manner. Shortly afterward some shots were fired from the rear but without effect, and then, in the language of one of the witnesses: "After that two shots come, them two fellows, Raphael Petruzo and Spenelli. They come with a gun right in the hand. I say to Shorty, 'Where you going to, boys?' I call Spenelli Shorty. He never tell me nothing, just pass me. They shoot Sam Radich right there by me, that man was in the lead. All these men were there at the time the shooting took place. These two had two revolvers in their hands. They were using them. They were shooting men with the revolvers."

Another one testified: "I saw these two fellows [pointing to Spenelli and Petruzo] shoot. Antonio Spenelli and Raphael Petruzo both had guns in their hands. None of these Austrian boys did anything at the time of the shooting. When Spenelli had the gun, he was in the middle and shoot Sam Radich. Petruzo was going along the front shooting too."

The dying declaration was admitted in evidence without objection, but prior to its introduction, Dr. A. S. Bradshaw tes-

tified that he treated Radich for the wound, which was in the lower right-hand portion of the abdomen, "in a place liable to produce death. He was suffering a good deal of pain when I was called' upon. I informed Radich that he would die." He was then asked the question: "From your experience in seeing persons wounded, what was your opinion as to his living or dying at that time?" The defendant objected "on the ground that it is not pertinent or material to the case, the opinion is absolutely immaterial for any purpose that I can see, the question so far as this witness goes is whether he lived 'or died." It is perfectly apparent, however, that if defendant was technically correct in his position, the ruling of the court in permitting the question to be answered was entirely without prejudice, as the doctor had quite positively declared his opinion when he stated to the deceased "that he would die." Considering, also, the nature of the wound, there could be no difference of opinion as to its probable outcome. The doctor proceeded to state: "At the time I told him he was going to die, my opinion was then he would certainly die. I think I informed him through another party at the time they were brought ·in before he made any statement. I told them to tell him he couldn't get well, he ought to tell the truth. I think these parties were brought before him at the time. I think they were all lined up before the bed where he could see them all. When these parties were brought before Sam Radich he pointed out two who he said were shooting at him. Their names were Petruzo and De Carlo." On cross-examination he testified: "All that I had to do with him was done through an interpreter and the interpreter spoke to him." The defendant then moved "to strike out all the testimony of Doctor Bradshaw· as to anything connected with a ' dying declaration on the ground that it appears to be irrelevant, immaterial and incompetent, no proper foundation laid for its introduction, it being apparent the witness himself doesn't know what statement the man made."

It is, of course, well settled that a witness is incompetent to testify to a declaration made by a party when it is necessary to have it translated before it can be understood by the witness. It is clearly hearsay, as the witness necessarily testifies to what the interpreter declares that the other party said. (*People* v. *Ah Yute,* 56 Cal. 119; *People* v. *John,* 137

Cal. 220, [69 Pac. 1063].) But here the doctor gave the testimony without objection after stating that his communication with the wounded man was through other parties. The defendant was therefore informed of the infirmity which he afterward urged in support of his motion, and he should have objected if he desired to have the testimony withheld from the jury. "An objection to testimony as hearsay and incompetent cannot be taken for the first time by a motion to strike out." (*People* v. *Samario*, 84 Cal. 484, [24 Pac. 283]; *People* v. *Nelson*, 85 Cal. 425, [24 Pac. 1006].) The ruling of the court could be supported also upon other grounds, if required. For instance, the physician testified that the deceased "pointed out" the defendant and another person as those who had shot him. The purpose for which the various persons were brought into the room could hardly be misunderstood, and, under the circumstances, the testimony of the physician related to an exoteric physical manifestation rather than to the declarations of the wounded man. It is also true that this testimony amounted to nothing more than a repetition of the written declaration which was translated so as to be understood by Radich before he signed it. Besides, W. A. Look testified that he was present at the time and Radich identified the two men in English. Franklin H. Smith, an officer, also testified: "I spoke to Sam Radich at this time in English. He seemed to understand me. I asked him if he was sure that this was the man that shot him, to make no mistake about it, he was about to die and I wanted him to be sure and make no mistake as to the identity of the men. He said that was the man that shot him, and that other man shot too. He pointed to Petruzo as the man that shot him. De Carlo was the man that was also pointed out as the man that also shot." If the said ruling, therefore, had been erroneous, it would simply constitute error without prejudice.

The same suggestions will apply to the ruling in relation to the similar testimony of the witness Cleveland, who prepared the said written dying declaration. It is true, that one Marcus testified in regard to the identification that "then he [Officer Smith] bring them three together after this, they point them out. Sam Radich pointed these two men out here [pointing to Spenelli and De Carlo]. I don't know whether they gave their names at the time they were pointed

out. Peter gave his name; Sam gave his name to these two
men that they both shot at him. Sam Radich picked out the
two men that shot at him at that time." The jury prob-
ably concluded that the witness was mistaken as to the two
men identified by Radich, but at any rate, the testimony of
the other witnesses and the statement in the said dying decla-
ration were positive and overwhelming as to the identification
of the defendant as one of the parties participating in the
homicide. It is entirely immaterial that the witnesses did
not all agree as to whether defendant alone fired the fatal
shot or aided and abetted in the consummation of the crime,
since there was ample evidence on either theory to justify
the conviction. Nor was the district attorney required to
elect one or the other of these positions upon which to base
his claim for a verdict. His duty was done when he had
presented the evidence. It was for the jury, under proper
instructions, to follow the witnesses whose testimony carried
conviction. The case is not like those where the evidence
tends to connect the defendant with separate offenses. An
example of this latter character is found in *People* v. *Will-
iams,* 133 Cal. 165, [65 Pac. 323], where the evidence dis-
closed many separate acts of intercourse by the defendant
with the prosecutrix, and it was properly held that the main
charge relied upon for a conviction should be selected and
the defendant should be notified thereof at the beginning of
the trial. After stating that the court below had charged
the jury to the effect that if they believed that defendant
had had sexual intercourse with the prosecutrix at any time
within three years before the finding of the indictment, she
being under the age of sixteen, they must find him guilty,
the supreme court says: "The jury were not even told that
they must all agree that some specifically described act had
been performed. A verdict of guilty could have been ren-
dered under such an instruction, although no two jurors
were convinced beyond a reasonable doubt, or at all, of the
truth of the charge, as to any one of these separate offenses."
But in the case at bar the witnesses testified to only one
transaction and one offense. Under the law the defendant
was a principal in either of the contingencies to which we
have referred, and he could justly be convicted of the charge
of murder, although some of the jurors may have believed

that he personally fired the fatal shot, while others were convinced that he was an aider and abetter in the crime. However, if it were necessary to uphold the verdict, we should be guided by the presumption that all the jurors adopted the same theory.

It can hardly be seriously contended that the court committed error in sustaining the district attorney's objection to a question asked of the witness Petrino as to a conversation he had with one Mangano. The question was: "Did he say anything to you about any shooting the night before?" It is true that "the facts, circumstances or declarations which grow out of the principal fact in question which are contemporaneous with it and serve to illustrate, qualify or explain it constitute the *res gestae* (*Gillam* v. *Sigman,* 29 Cal. 638)," and for that reason are admissible, but the term "*res gestae*" is not so comprehensive as to include declarations made upon the day following and many hours after the homicide.

The court gave this instruction to the jury: "You are instructed that if you believe upon the evidence to a moral certainty and beyond a reasonable doubt that the defendant was present, aiding and abetting in the commission of an unlawful act, and that in the commission of said unlawful act Sam Radich was killed, then it will be your duty to bring in a verdict of guilty of murder in the first degree." Abstractly considered, this is manifestly an erroneous statement of the law. Subdivision 2 of section 192 of the Penal Code provides that a person is guilty of involuntary manslaughter where death results, "in the commission of an unlawful act not amounting to a felony," and the aider and abetter can be guilty of no greater offense than the principal. Indeed, the instruction is accurate only as applied to certain felonies. (Pen. Code, sec. 189.) But this instruction, as others, must be considered in view of the undisputed evidence in the case. (*People* v. *Piner,* 11 Cal. App. 542, [105 Pac. 780] ; *People* v. *Whalen,* 154 Cal. 475, [98 Pac. 194].) The only unlawful act of which there is a particle of evidence is the deliberate attempt to take the life of Radich and his associates, unless it may be held that there is some evidence of an attempt to perpetrate robbery, and this latter contingency would bring

the instruction within the contemplation of the statute. The instruction was, of course, intended to present the law applicable to a certain feature of the case disclosed by the evidence, and it must have been so understood by the jury. It is probably capable of the interpretation put upon it by appellant when he says: "The court in effect tells the jury that if they believe from the evidence that the defendant was present and abetting some other person in the shooting of wild game out of season, or any other trivial misdemeanor, and that in the commission of such an unlawful act Sam Radich was accidentally killed, the defendant would be guilty of murder in the first degree." But if the instruction had been given in so many words it would have been manifestly without prejudice, as there was no evidence of such hypothetical case.

In *People* v. *Whalen*, 154 Cal. 474, [98 Pac. 194], the supreme court, referring to a certain instruction, said: "Upon the other proposition, it may be conceded that if the instruction is taken alone, without reference to the facts of the case or the crime involved, and as an abstract proposition, it would be erroneous. . . . But an instruction may be incorrect as an abstract or general proposition and yet not erroneous when considered in connection with the particular case and the facts to which it relates." Here the unlawful act to which the court referred is pointed out in another instruction given at the request of defendant: "You are instructed that every defendant on a trial for homicide is to be judged according to his own intent, and where he is charged as an aider and abetter, he is to be tried according to the intent with which he may have participated. It must therefore be proved to a moral certainty and beyond all reasonable doubt that the person charged as an aider and abetter, of his malice aforethought was present, aiding and abetting his principal in the act of taking the life of the deceased. Unless you are convinced to a moral certainty and beyond all reasonable doubt that there existed in the mind of the defendant the intent to unlawfully take the life of Sam Radich, you cannot convict him of murder."

There is no error in the following instruction: "If you are satisfied to a moral certainty and beyond a reasonable doubt that the crime of murder has been committed, and there is

evidence sufficient to satisfy you to a moral certainty and beyond a reasonable doubt that defendant is guilty thereof, then the motive for its commission is unimportant and not material.'' It was simply equivalent to a direction that the jury might convict the defendant of murder if they were satisfied of his guilt, although no motive for the crime was disclosed. This cannot be questioned. As stated in *People* v. *Owens,* 132 Cal. 471, [64 Pac. 771] : ''While the motive for the commission of the homicide is not plainly manifest from the evidence, yet the establishment of a motive is not at all essential as an element necessary to justify a conclusion. The presence or absence of motive is simply a circumstance in each particular case, sometimes weak and sometimes strong, going to the question of guilt or innocence. (*People* v. *Durrant,* 116 Cal. 179, [48 Pac. 75].)'' That the court could not have been understood as minimizing or ignoring the importance of the question of motive is shown by this instruction given at request of defendant: ''You are instructed that if the evidence fails to show any motive on the part of the accused to commit the crime charged, this is a circumstance in favor of his innocence which the jury ought to consider, together with all the other facts and circumstances, in making up their verdict. The absence of all evidence of an inducing cause or motive to commit the crime, when the fact is in reasonable doubt as to who committed it, affords a strong presumption of innocence.''

There was evidence that after the arrest and while the defendant was in the county jail he made an attempt to escape. The jury were instructed that if they found this to be true from the evidence, ''that fact of itself is not evidence of guilt, but it is a circumstance that the jury may well consider in determining the guilt or innocence of the defendant.'' The particular objection is to the use of the word ''*well*,'' but it is apparent that if the jury should consider it at all, they might *well* consider it. It cannot be said that it is an instruction as to a matter of fact or that it contains anything indicating a purpose to throw ''the influence of the court into the balance against the defendant.'' A similar instruction was approved in the case of *People* v. *Strong,* 46 Cal. 302, and *People* v. *Welsh,* 63 Cal. 167. The instruction is probably more favorable to defendant than he could ex-

pect, since the court declared that the attempt to escape "of itself is not evidence of guilt," but of this appellant cannot complain.

In view of the facts and circumstances of the case, the jury could not have been misled by the following instruction: "You are instructed that every person is presumed to intend what his acts indicate his intention to have been; and if you find, from the evidence, beyond a reasonable doubt, that the defendant fired a loaded pistol at the deceased and killed him, the law presumes that the defendant intended to kill the deceased, and unless it is shown by the evidence that his intention was other than his acts indicated, the law will not hold him guiltless." A similar instruction was approved in *People* v. *Langton,* 67 Cal. 427, [7 Pac. 843], and *People* v. *Bushton,* 80 Cal. 162, [22 Pac. 127]. It was, however, condemned in *People* v. *Newcomer,* 118 Cal..263, [50 Pac. 405] , *People* v. *Solani,* 2 Cal. App. 225, [83 Pac. 281], and *People.* v. *Grill,* 3 Cal. App. 514, [86 Pac. 613]. But in the first two of these the defendant claimed self-defense, and there was evidence in support of it. Hence, while there was no controversy as to the intention to kill, it was error to instruct the jury that guilt would follow from such intention.

In the Grill case the defense was based upon the claim of accidental homicide, and the defendant so testified. Under the peculiar facts it was held that the presumption that a person intends the natural consequences of his act must give way to the presumption of innocence. It is worthy of note, however, that in the Newcomer case the court declared its indorsement of the position that an intention to kill would be inferred from "the shooting of the deceased with a pistol," and in the Solani case it is said: "The shooting with a pistol would naturally indicate intent to kill, and would be sufficient proof of such intent if there was no other proof tending to show that he did not intend to kill." Here, as we have seen, the concluding portion of the said instruction which was the subject of animadversion in the cases cited by appellant is entirely without prejudice in view of the evidence and other instructions. (See *People* v. *Besold,* 154 Cal. 363, [97 Pac. 871].)

The court refused the following instruction requested by defendant: "You are instructed that if a person is killed by

a bullet fired from a pistol, and two persons, each at the same time, fire loaded pistols at him, and one of the persons who fired is on trial, and there is no conspiracy proven between the two persons who fired, and the jury are in doubt as to which shot killed the deceased, the defendant is entitled to the benefit of that doubt and should be acquitted.'' The instruction would have precluded the jury from considering the theory that defendant was an aider and abetter, although there might be no conspiracy, and for that reason it was properly rejected. In the discussion of a somewhat similar instruction in the case of *People.* v. *Woody,* 45 Cal. 289, the contingency that we have just suggested seems to have escaped the attention of the court. It certainly would be a reproach to the law if it countenanced the doctrine that where A and B deliberately and unlawfully fire at C with intention to kill him, and one shot takes effect causing his death, but it is uncertain whether A or B fired it, neither can be convicted of murder unless a conspiracy should be shown between them. In any rational view, each must be considered as aiding and abetting the other, and both responsible for the homicide.

Complaint is made of the action of the court in refusing some other instructions, but the principles embodied therein, as far as they were correct and pertinent, were covered by the instructions given.

It may not be amiss, in conclusion, to repeat the suggestion, which has been given substantially in other opinions of appellate courts, that if the district attorney in every criminal trial would carefully prepare and formulate the various principles of the law involved in the evidence presented on behalf of the people, scrupulously adopting the form of statement that has been approved by the supreme court in its latest utterances, and the trial court would adopt this, together with whatever pertinent and correct instructions may be requested by defendant, as its charge to the jury, only supplying what may seem necessary in the interest of justice, the probability of a reversal of a righteous verdict would be greatly reduced.

The judgment and order are affirmed.

Hart, J., and Chipman, P. J., concurred.