Los Jueces Asociados Sres. Wolf y Franco Soto no intervinieron en la resolución de este caso.

---

EL PUEBLO, DEMANDANTE Y APELADO, *v.* IBERN, ACUSADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Aguadilla en causa por asesinato en segundo grado.

No. 1961.—Resuelto en mayo 29, 1923

JUICIO RÁPIDO—JUSTA CAUSA PARA LA SUSPENSIÓN DEL JUICIO—SOBRESEIMIENTO. Las cortes tienen cierta discreción para decretar *ex parte* la suspensión de un juicio y en tales casos el gobierno está en el deber de justificarla.

ID.—ID.—ID.—La suspensión de un juicio por un período que en realidad es menor de dos meses, para conseguir un testigo esencial que está tratando de recuperar su salud, constituye una suspensión por justa causa.

ID.—ID.—ID.—En el presente caso el acusado pidió el sobreseimiento amparándose en el inciso 2 del artículo 448 del Código de Enjuiciamiento Criminal. *Se resolvió:* que descontando los 28 días anteriores a la radicación de la alegación general en julio 7, descontando toda o parte de las vacaciones, descontando toda o una parte de la suspensión debido a la ausencia de un testigo esencial, debe concluirse que tanto la letra como el espíritu del artículo 448 han sido cumplidos y que se ha mostrado justa causa en sentido contrario en oposición a la moción del acusado.

JURADO—RECUSACIONES.—Es erróneo requerir a un acusado a recusar cuando el jurado está incompleto; pero cuando tal proceder de la corte no obligó al acusado a utilizar una sola recusación perentoria, el error no es perjudicial.

ID.—DISCRECIÓN JUDICIAL.—El permitir al fiscal reinterrogar a un miembro del jurado es discrecional.

ASESINATO—PRUEBA DE LA MUERTE DE LA VÍCTIMA.—La viuda que asistió a su esposo hasta el momento en que murió éste, es testigo competente para establecer la muerte; por consiguiente, la admisión posterior de una certificación informal de defunción, de ser un error, no era perjudicial.

ID.—PREGUNTAS CAPCIOSAS.—Las preguntas capciosas están dentro de la sana discreción de la corte. Permitir que se pregunte a un perito médico si una persona puede morir de septicemia no es abuso de discreción.

ID.—DISPAROS SIMULTÁNEOS—*Res Gestæ*—PRUEBA.—Cuando la muerte es el producto de disparos simultáneos de A y B, un revólver admitido como prueba en el juicio contra B es admisible, como parte que es de la *res gestæ*, en el juicio contra A.

ID.—MÓVILES DEL CRIMEN—PRUEBA ADMISIBLE.—No es errónea la admisión de testimonios que si bien no arrojan luz en cuanto a los disparos, tienden a probar los móviles del crimen.

Los hechos están expresados en la opinión.

Abogados del apelante: *Sres. J. Valldejuli, E. González Mena* y *J. Soto Rivera.*

Abogado del apelado: *Sr. José E. Figueras, Fiscal.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

Esta fué una causa en la cual la acusación fué formulada el día 9 de junio de 1921. El señalar la lectura de la acusación para el 17 de junio, como se hizo era enteramente razonable. En dicho día 17 de junio compareció el acusado y su abogado solicitó treinta días de término para contestar la acusación. La corte concedió veinte días y el 7 de julio, que era el último de la prórroga contestó el acusado y alegó su inocencia. La corte entró en su período de vacaciones en primero de agosto y reanudó sus sesiones el día primero de octubre. El caso fué señalado entonces para el 19 de octubre. En 18 de octubre compareció el fiscal del distrito y solicitó la suspensión del caso por encontrarse ausente un testigo esencial. El día 19 el fiscal presentó un *affidavit* para sostener la moción en el cual expresaba que el abogado del acusado no estaba dispuesto a admitir el hecho sobre el cual se declararía, o sea, que la muerte que había de probarse se debió a las heridas. La moción por parte del fiscal de distrito era hasta cierto punto *ex parte.* La corte decretó la suspensión del juicio el cual comenzó el día 14 de diciembre continuando hasta dictarse sentencia contra el acusado. Con anterioridad a esto, o sea, el día 12 de diciembre, el acusado solicitó el sobreseimiento y archivo de la causa por no haberse celebrado el juicio dentro de los 120 días después de formulada la acusación. La corte declaró sin lugar la moción por entender que si bien habían transcurrido más de 120 días fué por causa justa y razonable; que de los autos

aparecía que el acusado contestó la acusación en 7 de julio
de 1921; que en primero de agosto la corte entró en su pe-
ríodo de vacaciones hasta el primero de octubre; que se-
ñalado, el día 19 de octubre para la vista del juicio a petición
del Pueblo suspendió la celebración del juicio por la razón
de que el Dr. Jorge del Toro, testigo principal en el pro-
ceso, cuya declaración era absolutamente esencial embarcaba
para los Estados Unidos para recuperar su salud, pues es-
taba padeciendo de agotamiento físico, siendo por tanto im-
posible su comparecencia en la corte, haciendo referencia la
corte a la prueba que consistía en el *affidavit* y las certifi
caciones de los doctores Belaval y López. Se alega como
error el haber la corte declarado sin lugar la moción.

Alega el apelante que el acusado estaba listo para el
juicio el día 19 de octubre. Asumiendo o presumiendo este
hecho, el gobierno no lo estaba. La corte debió haber es-
tado verdaderamente convencida de que era necesaria la sus-
pensión. Parece ser un hecho cierto que si bien la moción
de suspensión fué notificada al acusado, no lo fué el *affidavit*
del fiscal que la sostenía. Es una probabilidad razonable que
fué una sorpresa para el fiscal el viaje del doctor del Toro.
De todos modos el *affidavit* del fiscal estaba radicado el día
señalado para la celebración del juicio, o sea, el 19 de octu-
bre. En ese día las partes estaban obligadas a comparecer.
En dicho día la corte resolvió la moción. En el *affidavit* se
hacía constar la tentativa por parte del gobierno en hacer
que el acusado admitiera la veracidad de la declaración del
doctor del Toro. No es, pues, una inferencia violenta que
el acusado sabía lo que estaba ocurriendo, y la radicación
de la moción el día anterior al juicio era aviso de que el
juicio probablemente sería suspendido. También hace men-
ción el acusado hacia el hecho de que las certificaciones de
los doctores Belaval y López no estaban juradas. Como
todas estas cosas sucedieron el día del juicio y no hay nin-
guna indicación de que el acusado hiciera objeción alguna a

las alegadas informalidades o falta de notificación, ya por medio de moción para eliminar, o de otro modo, creemos que no deben ser consideradas especialmente.

En el caso de *Dyer* v. *Rossy*, 23 D. P. R. 772, considerábamos la necesidad de una suspensión del juicio según se presentaba en ese caso, pero prescindiendo de informalidades la presente moción y *affidavit* revelaban *prima facie* que el Dr. del Toro era un testigo esencial; que tenía que salir repentinamente y por tanto que no había falta de diligencia por parte del gobierno, cumpliendo así con el artículo 202 del Código de Enjuiciamiento Civil. No siempre es necesario para una parte el especificar cuándo es que puede encontrar un testigo esencial. El artículo 202 nada dice sobre esto, pero la corte tiene el poder inherente de exigir al promovente que especifique o tome deposiciones, o algo semejante.

Además, creemos que la corte tiene cierta discreción para decretar la suspensión *ex parte*. Es solamente cuando se demuestra la naturaleza *ex parte* de la suspensión que está el gobierno en la obligación de justificar dicha suspensión. Hacemos mención de esto porque el fiscal dice, citando el caso del *Pueblo* v. *París,* que la presunción es que una suspensión decretada por la corte es por justa causa. Esto es cierto a falta de alguna demostración, pero no cuando el acusado prueba una falta de notificación. Entonces incumbe al gobierno acreditar que la suspensión tuvo lugar por justa causa.

Con respecto a la esencialidad de la declaración del Dr. del Toro llama el acusado la atención hacia el hecho saliente de no haber sido presentado el Dr. del Toro en el juicio, tomada su deposición, ni explicada su ausencia. La corte, sin embargo, tenía derecho a creer que el doctor del Toro era un testigo esencial. Que el fiscal fué finalmente al juicio sin un testigo esencial si bien puede ser una circunstancia, no indica necesariamente que su moción era "frívola" o "incierta." El fiscal puede creer que aún estando todavía in-

dispuesto o ausente un testigo que es esencial podrá probar su caso lo mejor que le sea posible.   Que el Dr. del Toro era un testigo esencial e importante lo demuestra el hecho de alegar el apelante en uno de sus señalamientos de error que no se probó debidamente que la muerte en cuestión fué producida por el disparo.

Por tanto, el hecho mismo de suspender un juicio por un período menor de dos meses para conseguir un testigo esencial que está tratando de recuperar su salud, constituye una suspensión por justa causa.   Por consiguiente, si en octubre 19, día señalado para el juicio, el acusado no tenía derecho entonces a un sobreimiento, la suspensión subsiguiente, siendo razonable, no puede servir al apelante.

El artículo 448 del Código de Enjuiciamiento Criminal prescribe lo siguiente:

"A menos que exista justa causa contraria, el tribunal decretará el sobreseimiento del proceso en los casos siguientes:

"1. Cuando una persona haya sido detenida para responder por la comisión de un delito público, siempre que no se haya presentado acusación contra ella en el término de sesenta días desde su detención;

"2. Cuando un acusado, cuyo juicio no haya sido transferido a petición suya, no sea sometido a juicio en el término de ciento veinte días, a contar desde la presentación de la acusación."

El día de la lectura de la acusación solicitó el acusado y obtuvo una suspensión hasta el día 7 de julio.   La corte, entonces, estuvo justificada en contar el tiempo desde el cual el estatuto empezaba a correr a partir del 7 de julio.   Antes de ese tiempo era imposible la celebración de un juicio debido a la actuación del acusado y esto sin insistir demasiado en el hecho de que la alegación finalmente presentada pudo al parecer haber sido formulada inmediatamente y sin insistir demasiado en que el acusado pidió una suspensión hasta el día 17 de julio.   Contando desde el 7 de julio hasta el 19 de octubre transcurrieron 104 días.

En el caso de *El Pueblo* v. *Nigaglioni*, 28 D. P. R. 232, al interpretar el artículo 448, *supra,* esta corte resolvió que al determinarse si al acusado se le había concedido o no un juicio rápido el hecho de que la corte de distrito en particular había estado de vacaciones, no constituía por sí justa causa para suspender el juicio. Pero no dijimos ni quisimos decir que las vacaciones de la corte no podía nunca considerarse al resolver si un acusado había obtenido o no un juicio rápido

El juicio podría haberse celebrado entre el 7 y 31 de julio. Pero cuando se suspende un juicio hacia el final de un término a instancias de un acusado dando tal vez preferencia a los casos criminales pendientes y a otros asuntos como la formación del jurado, es razonable para una corte el suspender un caso de asesinato hasta después de sus vacaciones. Cierto deseo para tal suspensión por parte del acusado podría suponerse por la corte, y como el acusado solicitó una suspensión larga para presentar su alegación general, creemos que este es un caso en que podría descontarse razonablemente el período de las vacaciones.

El apelante hace un cálculo de 188 días a contar del 9 de junio hasta el 14 de diciembre. Descontando los 28 días anteriores a la radicación de la alegación en julio 7, descontando toda o parte de las vacaciones, descontando toda o una parte de la suspensión debido a la ausencia de un testigo esencial, creemos que tanto la letra como el espíritu del artículo 448 han sido cumplidos y que se ha mostrado justa causa en sentido contrario en oposición a la moción del acusado.

El tercero y cuarto señalamientos de error son los siguientes:

"Tercero: Haber ordenado que se examinasen los jurados por parte de la defensa cuando aún no estaban completos, estando los asientos vacíos en la totalidad que componen los doce del jurado.

"Cuarto: Haber resuelto que no habiendo comparecido todos

los jurados, se podía ir sorteando de los presentes e ir formando el jurado para entender en este proceso."

Dos paneles de jurados suplentes habían sido agotados y en el sitial sólo había diez hombres y la defensa insistió en que no debió haber sido obligada a recusar ninguna parte de ellos hasta que la urna estuviera completa. Cuatro habían sido aceptados, ocho fueron llamados y sólo seis comparecieron. Es algo dudoso si la objeción del acusado no era que un número suficiente de nuevos jurados no había sido citado, más bien que el sitial mismo no estaba completo. Pero daremos al acusado el beneficio de la duda. La práctica es casi universal al efecto de que antes de que se requiera a un acusado hacer recusaciones debe haber 12 hombres en el sitio ante él. No hemos examinado cuidadosamente los precedentes o las razones para esta práctica, pero es una perfectamente justa y razonable y en ausencia de algo que demuestre lo contrario aceptaremos por razón de la insistencia del apelante que el obligarle a recusar en este período de juicio constituyó error. La única cuestión entonces es si el error es de naturaleza esencialmente distinta a la desestimación de una recusación motivada cuando el acusado ha dejado de agotar sus recusaciones perentorias. En varios casos esta corte, citando autoridades, ha resuelto que en tales condiciones el acusado renuncia al error. *Pueblo* v. *Morales,* 14 D. P. R. 234; *Pueblo* v. *Vázquez,* 20 D. P. R. 361; *Pueblo* v. *Pillot,* 20 D. P. R. 376; *Pueblo* v. *Juliá,* 25 D. P. R. 258.

En el caso de *Hayes* v. *Missouri,* 120 U. S. 71, la corte se expresa en estos términos:

"Se le permitió hacer veinte recusaciones perentorias y no consta que él las agotara, dando así la corte aplicación al principio de que debe aparecer que el acusado agotó sus recusaciones perentorias. *De non apparentibus et non existentibus eadem est lex.* Véase también el caso de *Colgrove* v. *Falfurrias State Bank* (Tex.), 192 S. W. 581."

Pasemos entonces a la cuestión que resta sobre la naturaleza del error cometido. En el caso de *Hayes* v. *Missouri, supra,* la corte, por conducto del juez asociado Sr. Field, se expresó de este modo:

"En este país la facultad de la legislatura de un Estado para prescribir el número de recusaciones perentorias está limitado sólo por la necesidad de tener un jurado imparcial. En nuestras grandes ciudades hay tal mezcla de población, existe tal tendencia de las clases criminales de acudir a ellos y tan infortunada disposición por parte de los hombres de negocios de eludir el deber como jurados, que requiere cuidado especial por parte del gobierno para garantizar allí jurados competentes e imparciales. Y a ese fin puede ser un sabio procedimiento por parte de la legislatura el ampliar el número de recusaciones perentorias en los casos criminales que se celebran en esas ciudades. El acusado no puede quejarse si todavía es juzgado por un jurado imparcial. No puede exigir nada más. Northern Pacific Railroad v. Herbert, 116, U. S. 642. El derecho a recusar es el derecho a rechazar no a elegir un jurado. Si de aquellos que quedan se obtiene un jurado imparcial el derecho constitucional del acusado queda preservado. En este caso ni siquiera se ha sugerido que el jurado por el cual el acusado fué juzgado no era uno competente e imparcial. Se le permitió hacer veinte recusaciones perentorias y no consta que él las agotara."

Otras consideraciones generales y nuestros mismos casos, *supra,* demuestran que el modo principal de prueba es entonces si el acusado tuvo un jurado razonable e imparcial y la presunción fué que los doce hombres que juzgaron al acusado eran ciudadanos buenos, dignos y sin prejuicios, a menos que el acusado haga manifiesto algo en contrario, o por lo menos demuestre que fué obligado a ir a juicio cuando él no estaba satisfecho con el jurado y había sido indebidamente compelido a agotar recusaciones. *Pueblo* v. *Kromphold,* 157 Pac. 602, fué un caso en el cual el acusado había agotado sus recusaciones perentorias. Sin embargo, no había manifestado ningún desacuerdo con el jurado como estaba constituído ni ningún deseo de seguir haciendo recusaciones y

se resolvió que la desestimación indebida de una recusación motivada no perjudicaba.    No necesitamos ir tan lejos porque aquí no consta que el acusado agotara sus recusaciones perentorias.    En el caso de *Territory* v. *Padilla,* (N. M.) 71 Pac. 1084, la recusación como se hizo era una variación de la ley del Territorio.    La corte dijo lo siguiente: "Se confiere el derecho para recusar perentoriamente de modo que un jurado imparcial pueda obtenerse para juzgar un caso.    Es un derecho a rechazar y no a elegir," citándose casos.    La corte continuó diciendo: "Si se obtiene un jurado imparcial eso es todo lo que el acusado puede solicitar," citando el caso de Spies v. Illinois, 123 U. S. 168.

Además, podemos agregar que en cierto modo parece cómo si en una fecha anterior cuatro hombres fueron examinados.    Asimismo no parece que por el proceder de la corte al acusado realmente se le hizo utilizar una sola recusación perentoria mientras que el sitial no estaba completo.

La parte restante de los supuestos errores está resuelta por nuestra decisión en el caso de *Pueblo.* v. *Lanausse,* en el que resolvimos que la citación y selección de nuevos jurados era una cuestión dentro de la sana discreción de la corte.    No se demostró ningún abuso.

El permitir al fiscal hacer nuevos interrogatorios a un jurado era discrecional.

Se alegó haberse cometido error en lo que respecta a la prueba de la muerte de la supuesta víctima.    Que el registro civil no es el único medio de probar una muerte fué el efecto de nuestra decisión en el caso de *Pueblo* v. *Moreno,* 28 D. P. R. 104.    La viuda que estuvo con su esposo hasta el momento de su muerte es una testigo competente para establecer la muerte.

Por consiguiente, la admisión posterior de una certificación informal de defunción, de haber sido un error, no era perjudicial.

El apelante hizo un señalamiento de error sin límites con

respecto a las preguntas capciosas a las cuales se opuso y tomó excepción. Cada error debe consignarse especialmente. El apelante sólo discutió una alegada infracción.

Las preguntas capciosas están dentro de la discreción de la corte y el apelante no nos convence que fué abuso de discreción el preguntar a un perito médico: ''¿Una persona puede morir de septicemia?'' Este alegado error sin especificación de la pregunta capciosa era el número siete.

La alegación novena del señalamiento de errores expresa que la corte incurrió en error en haber permitido que en el proceso contra Juan Ibern Santiago se introdujese como prueba un revólver, siendo dicho revólver el mismo que se identificó y admitió por la corte en el proceso por el mismo delito contra Juan de Gracia que es una persona distinta de Juan Ibern Santiago y sin que tal revólver tuviese como prueba relación alguna con el acusado.

La información presentada en este caso es como sigue:

''Día 9 de junio de 1921.—Mediante esta información el Gran Jurado del Distrito Judicial de Aguadilla, P. R., acusa a Juan de Gracia, Juan Ibern Santiago y José Tormos del delito de asesinato en primer grado (*felony*), cometido del modo siguiente: Los referidos acusados Juan de Gracia y Juan Ibern Santiago, en época anterior a la presentación de esta acusación, o sea, allá por el día 23 de abril del año 1921, en la calle 'Progreso' de la ciudad de Aguadilla, P. R., que forma parte del Distrito Judicial del mismo nombre, allí y entonces, ilegal y voluntariamente, con malicia premeditada y expresa y firme y deliberado propósito de matar, acometieron y agredieron, haciendo uso de un revólver cada uno de ellos, a Emilio Iglesias, al cual le infirieron las siguientes heridas: herida de bala en la nariz orificio de entrada, lado izquierdo; herida de bala en el brazo derecho, antebrazo; herida de bala en el hombro izquierdo; herida de bala en la pierna derecha; herida de bala en el pie derecho, y a consecuencia de la herida de bala recibida en la pierna derecha, falleció el mencionado Emilio Iglesias el día ocho de mayo del corriente año, en el barrio 'Santurce' de la ciudad de San Juan.

''El acusado José Tormos es principal o autor en el crimen cometido, toda vez que maliciosa y premeditadamente ayudó y acon-

sejó a los mencionados Juan de Gracia y Juan Ibern Santiago, en la agresión que éstos realizaron en la persona de Emilio Iglesias, y se encontraba con ellos en el sitio y fecha mencionados en esta acusación, armado también de un revólver. Todo lo cual es contrario a la Ley para tal caso hecha y prevista y contra la Paz y dignidad de El Pueblo de Puerto Rico.—(Firmado) : José J. Acosta y Acosta, Fiscal del Distrito Judicial de Aguadilla.''

De modo que se imputó a los acusados en substancia el hecho de haber acometido y agredido con el propósito de matar a Emilio Iglesias, haciendo uso cada uno de los acusados de un revólver, e infiriéndole un número de heridas, y que a consecuencia de la herida recibida en la pierna derecha falleció el mencionado Iglesias.

En juicios criminales la frase "una parte de la *res gestae*" se emplea frecuentemente para describir, no el suceso o evento principal, sino algo preliminar o subsiguiente al mismo. Estrictamente hablando la frase comprende a la vez el suceso principal. En este sentido general el uso del revólver por Juan de Gracia fué parte de la *res gestae* descrita en la información, pero en efecto era parte del acto de disparar y dar muerte a Emilio Iglesias y como tal, parte del suceso principal. Para probar su caso, como fué presentado, el fiscal estaba quizá legal y moralmente obligado a presentar al jurado todos los medios empleados que pudieran haber causado la muerte a Emilio Iglesias, pero si estaba o no obligado, él seguramente tenía el derecho de hacerlo.

En varias jurisdicciones se han levantado cuestiones cuando ocurren disparos simultáneos dirigidos a la misma persona y sólo uno de los disparos es mortal, de si no es necesario demostrar de quién era el revólver de donde salió la bala fatal. De todos modos, si se están disparando varios revólveres y se presenta como prueba uno que claramente pertenece a otra persona, tal hecho tiene más bien que favorecer que no perjudicar a una acusado. Tiende a sostener la teoría de que la herida mortal no fué causada por el revólver del acusado.

En el caso de *El Pueblo* v. *Morine*, 72 Pac. 166, se probó que el acusado golpeó al interfecto con un hacha y que inmediatamente después S. infirió una herida mortal con una cuchilla que quedó probado concluyentemente que pertenecía a S. y no al acusado. La admisión de prueba en contra del acusado de que al día siguiente del homicidio S. vino a la tienda del testigo y compró un cortaplumas, no perjudicaba. La corte no vió claramente el objeto de la prueba y creyó que la presentación de la cuchilla era ilógica por razón de los hechos de ese caso, pero manifestó que era un error que no perjudicaba. El cuchillo también fué presentado en el juicio. Parece que no hubo ninguna duda de que el cuchillo mismo fuera admisible. Pero sostenemos que en el presente caso no solamente no hubo ningún perjuicio sino ningún error al introducir el revólver en evidencia.

Al ser ofrecido este revólver como prueba el acusado se opuso porque dijo que el revólver pertenecía a otro acusado y para nada se relacionaba con él. El fiscal entonces dijo: ''Son tres acusados, y tiene que relacionarse la prueba con cada uno de los acusados, el testigo ha declarado que Juan de Gracia le entregó ese revólver y en este caso se ha hablado de varios disparos de revólver y el fiscal tiene que presentar prueba para identificar el arma con que se han hecho esos disparos.'' En esta forma, aunque quizá no en el lenguaje más técnico pero sin embargo fundamentalmente, el fiscal expuso la verdadera regla aplicable a esta situación, o sea, que cuando se hacen disparos simultáneos a una persona todos los medios que eran parte de la *res gestae* en el sentido literal son pertinentes, propios y admisibles.

Formemos una idea de la situación legal: esta fué una causa contra tres personas a quienes se imputó el delito de disparar simultáneamente contra otra persona. Independientemente de toda cuestión de un propósito común de matar hubo un disparo común. Si los juicios de los acusados no hubieran sido por separado no se le hubiera ocurrido a nin-

guno de ellos oponerse a la presentación de este revólver. A
pesar de la separación de los juicios la información conti-
nuaba imputando un acometimiento y agresión común; un
disparo común y la consiguiente muerte. Hubo prueba ten-
dente a mostrar que el revólver ofrecido había desempeñado
un papel importante en el disparo simultáneo y común.
*People* v. *Marr Few,* 168 Pac. 577 (Corte de Distrito de Ape-
lación, Cal.), fué un caso en el cual el acusado y otras tres
personas perseguían a otra persona haciéndole disparos, de
cuyo acometimiento falleció dicha persona. La corte se ex-
presó en estos términos:

"En el presente caso existe mucha prueba de la cual podría
justamente inferirse la existencia de una conspiración entre el acu-
sado y sus dos compañeros para causar la muerte al interfecto, por
ejemplo, que el acusado y sus compañeros actuaban conjuntamente
en persecución del interfecto, y que el asesinato tuvo lugar mien-
tras existía una contienda de chinos entre dos asociaciones, de una
de las cuales el finado era miembro y a otra de las cuales el acu-
sado y probablemente sus compañeros pertenecían, y que el acu-
sado inmediatamente de ocasionar la muerte huyó al cuartel de sus
camaradas. Pero creemos que no es necesario fundarse en este
principio legal para sostener el veredicto y sentencia, pues enten-
demos que los hechos que se reseñan en cuanto a la participación
del acusado en el delito constituyen claramente un consejo o ayuda
al delito. La herida ocasionada por la bala de calibre 32 era de
carácter tan grave, aunque no necesariamente fatal, que el jurado
tenía derecho a suponer que había contribuído a la muerte del in-
terfecto. La persecución común del interfecto por las tres perso-
nas que deseaban realizar su asesinato constituía por sí una ayuda
de la mayor eficacia de una para con otra, y tanto así, que en nues-
tra opinión es lo mismo que si una de ellas hubiera hecho presa a
su víctima que huía y la hubiera derribado mientras los otros dos
le daban muerte. Los casos citados por el apelante de otras ju-
risdicciones, los que parecen adoptar un criterio diferente en cuanto
a la naturaleza de la acción común de dos o más personas en un
ataque simultáneo contra otra persona, no se recomiendan por sí
como basados en un razonamiento sólido. Preferimos seguir un
caso resuelto en nuestras propias cortes. People v. Petruzo, 13
Cal. App. 569, 581, 110 Pac. 324,329, en el cual se dijo lo siguiente:

"Ciertamente que sería un reproche para la ley si favoreciera la doctrina de que cuando A y B deliberada e ilegalmente disparan a C con intención de matarle, y uno de los disparos causa su muerte, pero es dudoso si A o B hizo el disparo, ninguno de los dos puede ser convicto de asesinato a no ser que se pruebe que existía una conspiración entre ellos. Bajo cualquier criterio racional cada uno de ellos debe considerarse como que aconseja o incita al otro, y ambos responsables del homicidio.' "

Por supuesto que no estamos considerando el caso de si es culpable de asesinato un hombre que hace un disparo simultáneamente con otro y no causa ninguna herida mortal, sino solamente la cuestión de si el fiscal no está en la obligación o tiene el derecho de presentar ante el jurado todas las cosas o hechos que puedan haber contribuído a la muerte de la víctima.

Sin embargo, fuertemente nos inclinamos a creer que la prueba directa y circunstancial de este caso y quizá más particularmente la última, indicaba un propósito común existente entre Juan de Gracia y Juan Ibern Santiago. Se demostró que ellos vinieron de Bayamón el día anterior y que estaban opuestos al establecimiento de una fábrica, cuya fábrica Emilio Iglesias procuraba establecer en Aguadilla. Se oyó a los acusados exhortar a los trabajadores para que no ayudaran a abrir la nueva fábrica. Estos dos acusados estaban juntos y dispararon simultáneamente a Emilio Iglesias. En tanto esto es prueba circunstancial "no necesita demostrar la culpabilidad del acusado más allá de la posibilidad de su inocencia, pero si las circunstancias como fueron establecidas producen una convicción moral con exclusión de toda duda razonable no necesitan ser absolutamente incompatibles bajo cualquier hipótesis razonable con la inocencia del acusado. En resumen, si·todas las circunstancias esenciales y pruebas se inclinan a la culpabilidad y excluyen cualquier hipótesis razonable menos la de la culpabilidad; en otras palabras, si son inexplicables por virtud de la teoría de la inocencia, está justificada una condena. 16 C. J. 775. Una

conspiración puede probarse por circunstancias y cuando és-
tas tienden a establecer una conspiración es al jurado y no
a la corte a quien incumbe resolver la suficiencia para pro-
bar. ese hecho más allá de una duda razonable. *People* v.
*Morine,* 77 Pac. 777. Hubo prueba suficiente en este caso
para someter al jurado el propósito común de los acusados.

En vista de esto y siendo la teoría del fiscal en gran
parte la prueba de tal propósito común, no puede haber duda
alguna en cualquier cosa que alguno de los alegados acu-
sados realizara era admisible contra el otro. Quizá si el
fiscal al momento de la moción solicitando juicios por se-
parado hubiera insistido en que él intentaba probar un pro-
pósito común, pudo haberse opuesto con éxito a la separa-
ción de estos juicios.

En este caso se permitió declarar a testigos que nada
sabían acerca de los disparos y especialmente a un jefe de
policía. La teoría era que estas manifestaciones tendían a
probar los motivos del acusado debido a una huelga y a un
cambio de fábrica en la cual el interfecto y el acusado esta-
ban relacionados. El apelante no nos convence de que se co
metió error.

El señalamiento décimocuarto se refería a mociones de
varias clases para obtenerse la absolución perentoria del
acusado por no existir prueba de que Emilio Iglesias falleció
debido a las heridas, y otros particulares, pero el apelante
no discute la cuestión y hubo prueba tendente a probar la
muerte causada por las heridas y lo demás como hasta ahora
se ha dicho.

Los demás errores alegados se refieren a la suficiencia
de la prueba. Ni el apelante como exigen nuestras reglas,
ni el fiscal, han hecho un resumen de los hechos del caso,
pero aparece que Emilio Iglesias falleció a consecuencia de
las heridas de bala que originaron infección, y se admitió
sin objeción prueba de que él recibió las heridas de bala y
tenía la infección, y hubo asimismo prueba pericial tendente

a demostrar que la infección fué la causa de la muerte a pesar de los esfuerzos hechos por salvar al lesionado por medio de amputaciones.  En verdad que las objeciones a la declaración del Dr. Igartúa que era uno de los médicos de Iglesias se formularon solamente a la pregunta capciosa.  Se le permitió declarar sin objeción que Iglesias tenía septicemia como consecuencia de heridas de bala.  La muerte quedó probada de otro modo.  La prueba circunstancial si no de otra clase, tendía a probar la muerte ocasionada por heridas de bala. La prueba circunstancial tendía a demostrar que el acusado era uno de un grupo que hacía disparos, y un testigo declaró haber visto disparar al acusado.  El móvil quedó demostrado por el cambio de lugar de la fábrica la cual Iglesias trataba de establecer y el acusado era uno de los empleados de la fábrica.

No encontrando ningún error perjudicial debe confirmarse la sentencia.

*Confirmada la resolución denegando un nuevo juicio, y la sentencia.*

Jueces concurrentes: Sres. Presidente del Toro y Asociado Aldrey.

El Juez Asociado Sr. Hutchison firmó: "Conforme con la sentencia."

El Juez Asociado Sr. Franco Soto no intervino en la resolución de este caso.