[Crim. No. 2451. In Bank.—May 3, 1923.]

THE PEOPLE, Respondent, v. OTIS B. BERRY, Appellant.

[1] CRIMINAL LAW — GRAND LARCENY — CONSPIRACY — SUFFICIENCY OF EVIDENCE.—In this prosecution for grand larceny it is held that the evidence was sufficient to demonstrate, not only the existence of a conspiracy, but also that the defendant was an active and interested member thereof.

[2] ID. — SEVERAL COUNTS IN INDICTMENTS — ACQUITTAL ON ALL BUT ONE—CONSPIRACY—EVIDENCE.—In such a case where the indictments contained several counts, it cannot be successfully said that by the acquittal of the defendant of all but one of the crimes included in the indictments the jury found defendant was not a member of a general conspiracy, but of only one conspiracy, and

---

1. What constitutes crime of, and evidence in prosecutions for, conspiracy, note, 3 Am. St. Rep. 474.

hence the evidence of the other offenses was inadmissible, and for that reason the defendant did not have a fair and impartial trial, where the evidence of each and all of the enumerated transactions, whether covered by the indictments or not, was admissible under the similar offense rule, as tending to prove a conspiracy.

APPEAL from a judgment of the Superior Court of Los Angeles County. Sidney N. Reeve, Judge. Affirmed.

The facts are stated in the opinion of the court.

Paul W. Schenck and Richard Kittrelle for Appellant.

U. S. Webb, Attorney-General, Arthur Keetch, Deputy Attorney-General, John W. Maltman, Deputy Attorney-General, Thomas Lee Woolwine, District Attorney, and Frank W. Stafford, Deputy District Attorney, for Respondent.

KERRIGAN, J.—Two indictments, one numbered 15595 and the other numbered 15932, were returned by the grand jury of Los Angeles County. That numbered 15595 contained five counts, in four of which defendant, with William Metler (*alias* Dorchester), Abner B. Thompson, Fred Williams, Joe Stanley, J. Carter, George Carter, John Doe Hathaway, J. W. Davis, and Fred Mayen, was charged with the crime of grand larceny; in the other count the same persons were charged with an attempt to commit the crime. Indictment numbered 15932 contained two counts, in each of which defendant, with Joe Quigley and John Doe Hathaway, was charged with the commission of the crime of ·grand larceny. In count number one of indictment No. 15595 the subject of the larceny was $43,000 in cash and a check for $1,176.45, obtained from one Thomas Donahue. Count number two was a different statement of the offense alleged in count number one. In count number three the charge was that of obtaining from John F. Herr certain certificates of corporate stock, bonds, and a book of traveler's checks, in all alleged to be of the value of $17,120. In count number four the subject of the larceny alleged was $24,000 in cash, obtained from John Basler. Count number five charged an attempt to commit grand larceny from Simon Weiss. In indictment No. 15932, count number one

charged the commission of grand larceny of certain United States bonds of the value of $2,255, from Albert Hageman, and count number two thereof was a different statement of the offense charged in count number one.

These indictments were consolidated, and defendant, severing from his codefendants, was tried thereon, the result of which was a verdict of acquittal upon all the charges save and except that presented by count number three of indictment No. 15595, wherein he was found guilty, as therein charged, of the larceny of the property described therein as belonging to John F. Herr. Judgment followed, from which defendant has appealed.

Appellant's chief contention is that the verdict is not justified by the evidence. The record on appeal is voluminous, consisting of some 3,200 pages.

It appears that prior to February 3, 1920, defendant was assistant cashier of the Citizens Trust & Savings Bank at Los Angeles, which bank, upon said date, upon opening a branch bank at Hollywood, placed him in charge thereof as manager. It also appears that in 1919 and in the early part of 1920 a band of crooks, commonly known as bunko-men, were operating a scheme whereby, due to their cupidity and gullibility, a number of persons possessing means were illegally divested of their property. With some slight variations, the *modus operandi* of these conspirators is specifically stated by appellant, as follows:

For at least several months prior to April, 1920, Los Angeles and vicinity was infested either with one general band of "crooks" or several and distinct bands of "crooks." Whether it was one general band or several bands working independently need not be discussed. Suffice it to state that, in the general outline, their nefarious schemes of defrauding were the same. About that time some two hundred "crooks" were in and around Los Angeles, working this game; that there were several different headquarters; that some of the gangs belonged to a "trust" and some did not; that some $100,000 to $200,000 per week had been taken out of Los Angeles for months by these gangs.

The defrauding scheme is what is known in police parlance as the "pay-off game"; and when reduced to its brutal last analysis consists in making some "honest" tourist to the beautiful shores of California believe that he can

make a huge fortune by "playing" Wall Street through some local "brokerage house" and, in any event, he can escape liability for loss, if he loses, by the use of fictitious or "phony" checks or "credit slips." He "wins" anywhere from $10,000 to a quarter of a million dollars; some trouble arises with the "brokerage house" in the matter of paying the "winnings," and this trouble is usually over the "credit slips," in that the money "won" cannot be paid until "credit is established" in order that the "brokerage house" may know that the "victim" could have paid his losses if he had lost; the victim usually goes hurriedly back to his home town and there converts everything available into current funds; more hurriedly he returns here to collect his "winnings"; another "play" is made; some "mistake" is made therein and all is "lost"; he is then sent to some far-off city to await the arrival of his associates and all will be regained by "playing" Wall Street again on the money to be furnished by his associates—who never come.

Needless to say the "brokerage house," the "play," the "winnings," and all else are pure fake. Readily to be apprehended is the fact that the securities—cashier's checks, drafts, certificates of deposit, stocks, bonds, or what not—which the victim brings back from the east must be converted into cash as speedily as possible and at the same time in a manner not to arouse suspicion.

The larceny for participation in which the defendant was convicted was one of several with which he was connected, evidence as to which was received at the trial. It is not necessary to detail it at great length, it being sufficient to refer to that part of it implicating the defendant. It may be premised that if each transaction stood alone, being conceived and conducted independently of the others and by different individuals, the defendant's contention that the evidence is insufficient to justify his conviction might have some force, but it clearly appears from the evidence that the offense of which the defendant stands convicted was but one of a series in all of which he was personally active, co-operating with different actors; and while in some cases his participation might appear to be innocent if it had been confined to each of them respectively,

his connection with all of them gives special significance to acts which might otherwise not suggest criminality.

Walter Evans was defrauded by Fred Mayen of $3,000, the two being engaged in a fictitious transaction ostensibly of a dubious character. Evans having a draft for this amount, drawn on the Citizens' National Bank of Los Angeles, was induced by Mayen to cash it at the Citizens' Trust and Savings Bank, of which the defendant was an officer, upon the representation that if presented to the Citizens' National Bank the nature of their transaction might be discovered. The defendant personally assisted in cashing the draft.

One Falligan became poorer by $20,000 through acquaintanceship made casually with Hathaway and Franklin. They persuaded him to open a small account at the Citizens' Trust and Savings Bank. He thereupon drew a check for $10,000 upon his home bank in Denver, Colorado, and deposited it at the first-named bank for collection. In due course he received from this bank a cashier's check for this amount, payable to himself, which he indorsed and handed to Hathaway on February 3, 1920. On this day the Citizens' Trust and Savings Bank opened a branch in Hollywood and placed the defendant in charge thereof, and on the same day the defendant presented this check to the First National Bank of Hollywood, bearing no indorsement from Hathaway, from whom he received it, and collected the amount thereof in cash. A second check for a similar amount, being a cashier's check issued by a bank in Colorado, was received by Falligan, who desired to cash it at the main office of the Citizens' Trust and Savings Bank, but was persuaded by Hathaway to take it to the Hollywood branch and to see the defendant personally about converting it into cash. Hathaway accompanied Falligan to the bank, but stood outside during the transaction.

John Gunther was swindled out of the sum of $15,000 by Stensland and Hathaway. Gunther had received from an eastern bank drafts aggregating that amount, which that bank directed him to present to the Continental National Bank of Los Angeles. He there deposited them for collection. He was then told by Stensland and Hathaway that he must transfer his account to the Hollywood branch of the Citizens' Trust and Savings Bank and do business

only with the defendant. He accordingly drew a check for this amount in favor of the Citizens' Trust and Savings Bank and handed it to the defendant for collection, who informed him that the money would probably be available the next day, February 25th. On that day Stensland, at the suggestion of Hathaway, took Gunther to Santa Barbara, where, on February 28th, they received a telegram from Hathaway telling them to return to Los Angeles, which they did, arriving there the next day, when Hathaway informed Gunther that his money had come. Gunther remarked, "We can do nothing to-day for it is after 3 o'clock, and the bank will be closed," to which Hathaway replied that the side door would be open. They all three went to the bank, Hathaway and Stensland remaining outside, and Gunther saw the defendant and withdrew the $15,000 in currency. In collecting this check the defendant did not send it through the clearing-house, but personally presented it to the Continental National Bank; he demurred to receiving a cashier's check for it, contrary to the usual courtesy between banks, and demanded cash. Gunther had not notified the defendant that he would require cash. It is also significant that Hathaway appeared to know when the money became available at the defendant's bank.

William Scheider lost, by the machinations of Anderson, Harris, and Mayen, $8,200. He desired to do his business with a certain Los Angeles bank, but Harris insisted that he should do it at his bank, and took him to the Citizens' Trust and Savings Bank (where, in fact, he had no account) and introduced him to the defendant. Later, in the course of a fictitious transaction, Harris and Mayen took Scheider to the defendant's bank to draw therefrom the above-named amount, they remaining outside. The money was handed to him by the defendant in a bundle inclosed in an envelope. Upon his emerging from the bank Harris remarked, "I will get my money, too," entered the bank, and in a few minutes returned carrying a package identical in appearance with that of Scheider. As we have seen, Harris had no account with this bank or any business with it.

Basler was defrauded of $24,000 by Rogers and Sellers in a spurious stock transaction. They persuaded him to go to the bank of the defendant at Hollywood, saying that it was not advisable to deal with the big banks of Los

Angeles, but they knew a bank in the country where they could deal safely. He followed this advice, and in the course of their dealings went to the defendant's bank for the purpose of withdrawing $24,000, going there in Sellers' automobile, accompanied by Sellers and Rogers. These two remained outside in the machine at a point whence they could see through the glass side and front of the bank what occurred in the defendant's office. Basler asked for his money. The defendant appeared to be very nervous and excited and took Basler down into the unfurnished basement of the bank and showed him a copy of a newspaper, "The Pink Record," of the previous day. Basler not having his glasses, the defendant read to him an article consisting of an *exposé* of the methods of a criminal band of swindlers, telling Basler not to say a word or he, the defendant, might have his head blown off or his throat cut. Basler, who was somewhat deaf, had not heard all that was read, and asked the defendant what he meant, to which he replied, "Go outside and tell those men your money has not come." But Basler insisting, the defendant led him upstairs and paid him $14,000, and promised to at once telegraph to a bank in Texas, upon which the remaining $10,000 had been drawn, and if that draft had been honored he would pay Basler the amount on receipt of the answer. He requested him to return at about 4 o'clock that day (Saturday), and promised that he would remain at the bank and keep enough money out of the vault to pay the draft. Basler returned at the appointed time, was admitted by the defendant through a side door, and received from him the remaining $10,000.

Hageman was another visitor to Los Angeles whose stay there was marred by the loss of the proceeds of the sale of $2,700 of Liberty bonds as the result of his acquaintance with two confidence operators, Quigley and Hathaway, already named. At their instance he opened a small account at the bank of the defendant at Hollywood. Quigley introduced him to the defendant, and requested him to write a letter to a bank in Nebraska, instructing that bank to forward Hageman's bonds. The letter was dictated by Quigley, typewritten by defendant, and signed by Hageman. A couple of days later Hageman called again at the bank and stated to the defendant that he was afraid he was

in bad hands and would lose his bonds, saying, "I don't trust those fellows," to which the defendant replied, "If you are as careful as you are now they can't beat you out of them." The bonds arrived in due course, and at Hathaway's suggestion Hageman requested the defendant to buy them, which the defendant said he could not do, since they were registered bonds, but that if Hageman would indorse them he would sell them for him. It was accordingly arranged that the defendant would sell them in Los Angeles and meet Hageman and Quigley on a street corner there and turn over the money in an hour. Defendant took the bonds to the Citizens' National Bank and sold them for $2,480. He then met Hageman and Quigley at the appointed place, took them into the lobby of a near-by hotel, and, according to Hageman's version, turned over to him $2,235, according to his own account the full amount. The defendant took no receipt or other evidence of payment.

Donohue parted with over $42,000 through the intermediary of defendant's friend Dorchester and the latter's confederate Thompson. Complying with Dorchester's suggestion that he sell his securities, to the value of the above-named sum, he accompanied Dorchester to the Citizens' Trust and Savings Bank. He there, following the directions of Dorchester, who remained outside, saw the defendant, to whom he stated his business and that he had been recommended by Dorchester. The defendant replied that Dorchester was a friend of his and that he had known him for a couple of years. The defendant undertook to sell Donohue's securities through a stock broker, A. W. Coote. Donohue and Thompson then left the city for a few days, and being at Riverside they received a telephone message from Dorchester to come back to the city, that the money was available. The next morning Donohue, accompanied by Dorchester, went to the defendant's bank. He was then in possession of a check which, added to the money to be received for his securities, amounted to $42,032. Dorchester again remained outside the bank. Defendant at this time, having received from Donohue the before-mentioned check, handed to him the balance over and above $42,000, and told him to return a little later. He did so, again accompanied by Dorchester, who, as before, did not enter the bank, and was now told by defendant that his money was in town

but that he, Berry, did not have it in the bank, but to sit down while he went out to get it. The defendant at that time had a check from Coote, the broker, drawn against his own bank, which he had procured personally from Coote's office. In leaving the bank the defendant passed close to Dorchester, but Donohue could not tell if any conversation occurred between them. The defendant then went to the Farmers and Merchants National Bank and cashed the first of the above-mentioned checks. He had had issued by his own bank a draft for $40,000 against the Coote check. He personally carried this draft to the Citizens' National Bank and received on it $40,000 in large bills. He added to this amount about $1,400, the balance of the Coote check. When he returned to the waiting Donohue he had a bundle wrapped in a peculiar colored glazed paper, which he unwrapped, disclosing three smaller packages, each wrapped in the same kind of paper. The defendant stated the different amounts of money in each package, aggregating $42,000, without, however, exposing the same to view. He then wrapped the three packages in one bundle, and told Donohue that he was in a hurry and that Donohue could count the money later. As Donohue was leaving the bank the defendant remarked to him, "Remember, I am not your guardian," whereupon Donohue stopped and said, "Why, isn't Dorchester all right?" to which the defendant answered, "Yes, Dorchester is all right," adding that he had been a customer at the bank for a couple of years. The defendant then stepped out of the bank in advance of Donohue and passed close to Dorchester, standing in a crowd. Donohue and Dorchester then went to the office of Hutton & Company, where Donohue received a check for $1,176, which Dorchester suggested to him that he take to the defendant's bank and cash if the defendant were there. He went to the bank, but the defendant not being there he rejoined Dorchester, who was with Thompson at the Hotel Hayward. The three went to a room together, where Donohue placed his package of money on a dressing-table by the side of another package, wrapped in the same peculiar kind of paper as Donohue's and supposed to contain money belonging to Thompson. Thompson then went out to see about getting the profits from a fictitious stock deal which had formed the pretext for the conversion of Donohue's securities and checks

into ready cash, and also to file a selling order given him by Dorchester. Donohue, at Dorchester's suggestion, placed the $1,176 check upon his bundle of money. His attention was then engaged in decoding some telegrams and he failed to notice the disappearance of his package and check. Thompson returned in a few minutes with a tale of woe to the effect that he had made another stock transaction in which he had lost all. Then occurred a pretended fight between Dorchester and Thompson. Donohue was induced by the bunko-men to leave for New Orleans upon their promise to be there and meet him at a hotel. On the following day we find the defendant in possession of the $1,176 check, which he had received from Dorchester, and which he cashed at the Farmers and Merchants National Bank upon which it was drawn. In receiving it from Dorchester he had not required his indorsement. Two or three days thereafter Donohue, realizing that he had been swindled, returned to Los Angeles, went to the defendant's bank with a detective, and informed the defendant that he had been robbed by Dorchester, to which the defendant replied that if he ever saw Dorchester again he would hold him for the authorities. Nevertheless, we shall see that a few days thereafter he was again dealing with his friend Dorchester, but under the name of Albert Johnson, buying from him stolen securities and checks, utterly forgetful of his virtuous intention to bring his activities to the attention of the police, the record furnishing abundant evidence of the single identity of Dorchester and Johnson.

Mr. Herr made the acquaintance of Fred Williams in a city park in Los Angeles. They soon thereafter visited another of the city's recreation grounds, namely, Westlake Park, where they had the misfortune (for Herr) to meet Dorchester. We have already had some inkling of Dorchester's pursuits, which, the sequel shows, were shared by Williams. Herr was induced by these worthies to enter into a fictitious stock transaction, during the course of which he entrusted to Williams, duly indorsed, sixty shares of Pennsylvania Railroad stock, ten shares Guaranty Trust Company stock, a bank certificate for $500, $620 in travelers' checks, together with $12,000 of Liberty bonds. All these valuables were by Williams "lost" in the same manner as Donohue's securities, and Herr was hurried off to

New Orleans where his recently found friends were to join
him and together they were to retrieve their ill fortune.
Shortly thereafter he returned to Los Angeles, having re-
ceived a letter from the bank which had issued the $500
certificate that it had been collected through the Hollywood
branch of the Citizens' Trust & Savings Bank. He thereupon
called at said branch bank, his visit occurring some three
weeks after the time of the surrender of his securities to Will-
iams, and there for the first time met its manager, the defend-
ant, to whom he exhibited the letter above mentioned, which
stated that the certificate appeared to have been indorsed to
Albert Johnson. On this visit Herr was nervous and broken
down physically, and the defendant advised him to go up
the street and get a cup of coffee and stay away half an
hour. On his return he informed the defendant of the loss
of his railroad stock, the transfer of which he was trying
to prevent. The defendant told him that he had known
Johnson for two years, and understood he was in the moving
picture business, and that upon Johnson's inquiry as to a
bond house through which he could sell securities he had
recommended him to Aronson & Company of Los Angeles.
He also suggested to Herr that he employ a detective, and
on the evening of that day met him at a hotel, at which
time he told Herr that the detective he had in mind in-
sisted upon receiving a retainer. The defendant met Herr
again on the following evening and introduced him to two
city detectives. Aronson & Company had sold some of
the stock and requested Herr to cancel his order to the
corporation issuing the stock to stop its transfer. Herr
testified that the defendant advised him in this connection
that since he had indorsed the stock nothing could be done,
and advised him to sign a waiver, as requested by Aronson
& Company, which he did in consideration of $200 paid
by that concern. While not disclosing the fact to Herr
the defendant had also received $640 in travelers' checks
stolen at the same time as Herr's other securities.

Simon Weiss arrived in Los Angeles on January 28, 1920,
and early fell into the clutches of Preston and George James,
who were also known by the name of Conley and Fred
Mayen, respectively. In a pretended stock deal by these
men Weiss drew two drafts on North Dakota banks, which
he took to the Hollywood branch of the Citizens' Trust &

Savings Bank, Mayen having informed him that he must do business at that bank. Upon entering the bank he approached the assistant manager, observing which the defendant intervened and personally attended to the business of Weiss. The defendant, in sending the aforementioned drafts to a North Dakota bank, instructed the bank to hold them for a few days in order to give the daughter of Weiss, who had custody of certain certificates of deposit belonging to him, an opportunity to bring them in. The bank replied to this letter, inquiring what the defendant knew of the transaction in which Weiss was engaged which required the transfer of the money represented by the drafts, and stated that the writer had known Weiss and his family for many years and that for the past four or five years Weiss had not been responsible for his acts. In answer to this inquiry the defendant wrote that he would use his best efforts in every way to protect Weiss, and that as far as he could see he thought Weiss was in a legitimate deal. This statement of the defendant was based upon no information or knowledge whatsoever. In due time there were received by the defendant's bank for account of Weiss $1,950 and certificates of deposit aggregating $9,000, which information was conveyed to Weiss through Mayen, and Mayen transported Weiss in company with Conley to a place near defendant's bank. There he told Weiss to go to the bank and sell the certificates of deposit. Weiss went in, met the defendant, and told him he desired to cash said certificates. The defendant was not authorized to buy securities but was required to submit such transactions to the president of the bank, Mr. Monnette, at its main establishment. He thereupon went there with Weiss, and in presenting the transaction showed the president a letter, received from the North Dakota bank which had issued the certificates, saying that they would be paid upon maturity. He did not show to the president the other letter of the bank stating that Mr. Weiss had for some years not been responsible for his actions. In passing it should be mentioned that the defendant had already suggested to the president the purchase of the certificates two weeks before Mr. Weiss had requested the defendant to buy them. The president finally authorized their purchase, and entrusted the completion of the transaction to

the defendant, who thereupon, in the main bank, issued a draft upon a San Francisco bank, and also prepared a signature identification for Mr. Weiss under the seal of the bank. This he gave to Weiss, telling him he could use it in San Francisco in cashing the before-mentioned draft and others given him by defendant in payment for other securities. Weiss testified that he at no time requested payment in San Francisco exchange and never asked for the identification card. Mayen and Conley then informed Weiss that they must all go to San Francisco, the consummation of the stock deal in which they were engaged having been transferred to that city. They started on their journey the next day and were arrested en route. A search of Mr. Mayen's residence disclosed a large stock of bunko paraphernalia, all of which was of the same kind and character as that used in all bunko cases of which evidence was offered at the trial of the defendant. In all cases the name of the fictitious stock exchange was the International Exchange. The alleged brokers, namely, Dorchester, Hathaway, Mayen, and Sellers, all claimed to represent Sherwood, Sheppard & Company, New York. There was no such firm in existence. All used printed matter, blank orders, etc., of these two fake organizations, all of which, from their appearance, were procured either from Mayen or from his source of supply.

It was further shown in evidence that Mayen had visited the defendant at the main bank before the establishment of the Hollywood branch, and also at the latter establishment, a number of times. When calling he talked to no one in the bank but the defendant, and he had no account or other business with the bank; that on one night, in company with a Mrs. W. H. Edgington, he drove in an automobile to the home of the defendant, whom he designated to her as his banker, that the defendant came out to the automobile, and Mayen handed to him what appeared to be a roll of money.

[1] We have set forth at length much of the testimony, and we think it requires no further statement of the evidence, or argument, to demonstrate, not only the existence of a conspiracy, but also that the defendant was an active and interested member thereof. The jury is the sole judge of all controverted questions of fact, and its verdict, if

based upon evidence, is conclusive on the appellate courts. Disregarding the testimony of the defendant, and contradictions in that of some of the important witnesses for the people, and accepting, as did the jury, the state's view of the whole case, we are satisfied that the evidence, although circumstantial, shows, as above stated, criminal complicity of the defendant with the confidence operators, even to the extent, according to the testimony of Mrs. Edgington, of participating in the fruits of their unlawful operations.

[2] It cannot be successfully said that by the acquittal of the defendant of all but one of the crimes of the consolidated indictments, the jury found the defendant was not a member of a general conspiracy, but of only one conspiracy, and hence the evidence of the other offenses was inadmissible, and for that reason the defendant did not have a fair and impartial trial. We have no doubt that evidence of each and all of the enumerated transactions, whether covered by the indictments or not, was admissible under the similar offense rule as tending to prove a conspiracy. The interlocking of the participants in the various frauds, their common use of the same fictitious entities, their uniform insistence that their banking needs in carrying out their numerous swindling operations should be entrusted solely to the defendant as assuring an element of safety, were facts justifying an inference that a general conspiracy existed, and the defendant's guilty connection therewith was abundantly shown.

The court fully and fairly instructed the jury on the law applicable to the facts of the case, and it did not commit error in ordering the indictments consolidated. (Pen. Code, sec. 954.)

Judgment affirmed.

Lawlor, J., Waste, J., Seawell, J., Myers, J., Lennon, J., and Wilbur, C. J., concurred.

Rehearing denied.