[Crim. No. 1595. First Appellate District, Division Two.—January 20, 1931.]

THE PEOPLE, Respondent, v. JOHN J. COLLIER et al., Appellants.

Myron Harris, Leo A. Sullivan, R. B. McMillan and John W. Collier for Appellants.

U. S. Webb, Attorney-General, William F. Cleary, Deputy Attorney-General, Earl Warren, District Attorney, and Frank J. Coakley, Deputy District Attorney, for Respondent.

NOURSE, P. J.—The defendants were tried jointly on an indictment framed in four counts, the first of which charged conspiracy to ask and receive bribes, the other three charging completed acts of bribery. During the course of the trial the offense charged in count three was dismissed and the jury returned its verdict finding the four defendants guilty on the first count and not guilty on counts two and four. From the judgment on the verdict and from the orders denying their motions for a new trial the four defendants appeal upon a typewritten record. Each defendant was represented by individual counsel at the trial and each has filed separate briefs on this appeal requesting that any point raised by others be available to him. Upon some of the issues presented on the appeal the legal considerations are applicable to all appellants, but in most instances the circumstances are such that each appellant must be treated separately.

The story of the conspiracy originates in the testimony of Fred Smith, a co-conspirator. In the general election of 1926 a bitter contest was waged in Alameda County between B. F. Becker and Barnett, the incumbent, for office of sheriff in which Becker was successful. In January, 1927, Becker,

who had been chief of police of the city of Piedmont, brought with him to the sheriff's office the defendant John L. Davis, who had been associated with him in the Piedmont office. Davis was made a deputy sheriff. Collier, who had occupied that position for many years under the former sheriff, was retained. Shurtleff, who had formerly been a federal prohibition officer, was appointed by Becker as chief criminal deputy and Davis and Collier were assigned to work under him as a "raiding squad" to enforce the provisions of the Wright Act (Stats. 1921, p. 79) relating to the manufacture and sale of intoxicating liquor. The defendant Gardella was a confessed "bootlegger" operating in the eastern section of Alameda County.

Fred Smith met Becker and Davis while they were in the Piedmont office and became very active in Becker's campaign for sheriff in the fall of 1926. Soon after Becker assumed the office of sheriff in January, 1927, Davis sought out Smith and proposed his plan to force the bootleggers of the county to pay tribute for protection against arrest for violation of the prohibition law. In the latter part of January, 1927, Davis, accompanied by defendant Collier, appeared at Smith's place of business in San Leandro and, in the presence of Collier, told Smith that there were several bootlegging places operating in Livermore and vicinity which would "have to lay it on the line or get knocked off", and proposed that the three drive into Livermore, where he, Davis, would introduce Smith to the Gardellas. Davis then drove Smith and Collier to the Gardellas' bootlegging establishment, where all had drinks of liquor and where Davis introduced Smith as "the closest man in the county to the sheriff" and "the man to talk business to with regard to protection". Gardella replied that he had not been active in Becker's campaign; that he had been a "Barnett man", "but that if it was going to be necessary to pay for protection, if the business would afford it, why, he would do so". Gardella then said that under present conditions he could probably pay around $75 a month if he were assured of proper protection. Smith assured him that "that was all right", whereupon Collier left the party, saying that he would wait for them out in the car. Davis then went into the "barroom" while Gardella procured $75, which he paid to Smith. These two then joined Davis, who then said to Gar-

della: "If you got any other of your friends down here who are all right we can arrange the same thing for them." Gardella replied: "All right, I will have a talk with them." He, Gárdella, then mentioned Croce, Duarte, Valponi and another as bootleggers who could be expected to pay monthly sums for protection and the rate to be charged each was discussed among the three. They then agreed that Smith should return to Gardella in two or three days to receive the money which Gardella promised to collect from those mentioned. Davis and Smith then joined Collier in the car and Smith divided the money he had received from Gardella—$25 to Davis, $25 to Collier and $25 to himself.

A few days later, according to the arrangement made at the time, Smith returned to Gardella and received two envelopes, one containing $50, the other $25, which Gardella told him had been collected from two of the bootleggers and which Smith divided with Collier and Davis. From this time on to the early part of August, 1927, Smith continued the collection of monthly tribute from those engaged in the violation of the Prohibition Act, either in the operation of stills or in the transportation and sale of illicit liquor. These sums were divided one-quarter to Davis, one-quarter to Collier, one-quarter to Smith, and the remainder was held by Smith as a "trust fund" for campaign purposes, out of which he testified he paid a portion to Shurtleff.

During all this time the district attorney of the county maintained a staff of special detectives engaged in investigating violations of the Prohibition Act and the practice of the two offices was that when the district attorney's staff discovered violations of the act search-warrants were delivered to the sheriff's office for service. These warrants came into the hands of Shurtleff, who handed them to Collier and Davis for service. From the testimony of Collier and Davis it appears that during the period in question they found liquor and made arrests in ninety per cent of the raids made by them, but that they were unsuccessful in their raids upon the bootleggers in the vicinity of Livermore because they were always "tipped off" before they arrived. It was the theory of the state throughout the trial that this was the "protection" given to those who paid the conspirators and that information was always given in advance of a raid upon their friends, this information coming directly from

Davis before he and Collier left the sheriff's office or coming to the bootlegger from Smith through information furnished him by Davis, Collier or Shurtleff.

The foregoing statement of facts, which is taken mainly from the testimony of Smith, is sufficient, if corroborated in the particulars required by law, to involve all four defendants in the conspiracy charged. It is apparent from this evidence that the conspiracy was formed in the latter part of January, 1927, to ask and receive bribes for the purposes alleged in the indictment and that Davis, Collier, Smith and Gardella were the instigators of the conspiracy. The precise date when Shurtleff joined in the conspiracy does not appear. Hence, aside from the matter of corroboration, which will be treated later, the evidence is legally sufficient to sustain the verdict unless the testimony of Smith was incompetent for the reasons assigned by the appellant Collier.

The point raised by this appellant is that Smith, being an accomplice, was incompetent to testify regarding any of the agreements or conversations had between his co-conspirators until *after* the conspiracy was proved—that is to say, that evidence of these conversations was inadmissible to prove the *corpus delicti*. In this connection the appellant relies on subdivision 6 of section 1870 of the Code of Civil Procedure, which provides that ''After the proof of a conspiracy the act or declaration of a conspirator'' may be given in evidence ''against his co-conspirator''. From this it is argued that no evidence of the act or declaration of a conspirator can be received for the purpose of proving the conspiracy. The argument is based on what we deem to be a misconception of the meaning of the code and upon disconnected excerpts from decisions where the language has not been carefully chosen. The code section is an exception to the well-known hearsay rule which is stated in section 1845 of the Code of Civil Procedure, as follows: ''A witness can testify of those facts only which he knows of his own knowledge; that is, which are derived from his own perceptions, except in those few express cases in which his opinions or inferences, or the declarations of others, are admissible.'' Following this, section 1850 of the Code of Civil Procedure provides that when the declaration or act forms a part of the transaction, which is itself the fact in dispute, or evi-

dence of that fact, such declaration or act is evidence as part of the transaction, while subdivision 3 of section 1870 permits evidence of an act or declaration of another in the presence of a party and his conduct in relation thereto and subdivision 7 of the same section permits evidence when the act or declaration comes within the provisions of section 1850. Reading these sections together it seems clear that the purpose of the statute is that the act or declaration of a party could not be received in evidence as proof of a conspiracy with others until such conspiracy is established but that, when the matter at issue is the formation of the conspiracy, or the purpose for which the combination was made, evidence of the acts and declarations of the co-conspirators among themselves and in their presence is admissible for the purpose of proving that issue.

If this were not so let us see to what limits appellants' argument would carry us. A, B and C are charged with conspiracy to commit murder. A carries out the act and numerous eye-witnesses are called to testify concerning the acts of A in the commission of the homicide. Certainly their testimony would not be barred under this section because A is charged as a conspirator with B and C because such testimony would cover facts of the witnesses' own knowledge within the meaning of section 1845. But if A had made declarations involving B and C in the conspiracy such statements would be pure hearsay and inadmissible against B and C until the conspiracy had been proved. But if these witnesses overheard A, B and C plotting the murder, their testimony of these conversations had in the presence of all the conspirators would be admissible under the express provisions of subdivision 3 of section 1870, as well as under the provisions of section 1850. However, the latter section is nothing more than a restatement of the well-settled *res gestae* rule under which "where the making of a statement in controversy, or the doing of an act, assists in constituting the transaction or in proving *per se* a relevant fact, the declaration or act is competent". (22 Cor. Jur. 446. Such is the rule of *People* v. *Gregory,* 120 Cal. 16, 19 [52 Pac. 41]; *Gillam* v. *Sigman,* 29 Cal. 637, 641; *People* v. *Petruzo,* 13 Cal. App. 569, 577 [110 Pac. 324].)

The application of the rule to the instant case seems plain in so far as it relates to appellants Collier and Davis. They

were both sheriff's deputies assigned to the enforcement of the prohibition law. The conspiracy charged to them was their agreement to refrain from making raids upon violators of that law until information had been given permitting the destruction of evidence. In the formation of the conspiracy in January, 1927, no act or declaration was required from these two—all that was needed, and all that was done— was the lending of their presence in the company of Smith, who assumed the role of soliciting and collecting the bribe funds. This was the conspiracy which the prosecution sought to prove at that time—the *res gestae* was the conversations between Smith and Gardella in the presence of Davis and Collier and it is of no moment that, before the money was passed, Collier stepped outside. If he had then notified the others that he would not be a party to the transaction, or had later refused to co-operate, he might now complain, but his subsequent actions show a full acquiescence in the arrangements made by the others. Hence, these conversations were not hearsay under any possible theory, and were admissible against all the co-conspirators even though it might be said that the conspiracy was not "proved" until later on in the trial. The order of proof is not material. (*People* v. *Stokes*, 5 Cal. App. 205, 209 [89 Pac. 997].)

Neither Collier nor Davis denied their association with Smith and Gardella. They denied that they received any bribes from them and explained that they "worked" with Smith under instructions from the head of the office. We accordingly hold that Smith's testimony was admissible as tending to establish the formation of the conspiracy alleged in the indictment, and was competent proof of the acts and conduct of appellants Collier and Davis which made it possible for Smith to approach Gardella in the role he assumed as one of the conspirators. Whether this testimony had sufficient corroboration so that the "fact" of the conspiracy was *proved* is a question to be treated later.

Much is said in the brief of the appellant Collier regarding the bad reputation of Smith for truth, honesty and integrity. From this it is argued that his testimony should not be believed, but that, of course, was for the jury to decide. It is significant, however, that notwithstanding the reputation of this witness these two deputies associated with him constantly, calling at his home at least twice a

226

week over a period of six months and frequently, with their wives and other members of their families, joining Smith and his wife in drinking parties at the bootlegging places named by Smith as having paid for protection.

This appellant also urges the "improbability" of Smith's story of the conspiracy because Collier had met Smith but three weeks before the time testified to. But it does not appear how long Collier had known Davis and it is apparent from the record that Davis was the instigator of the entire plan and brought Collier to Smith with the proposal that Smith act as the go-between to make the collections from the bootleggers, leaving the deputies in the clear to deal with Smith alone. █ We understand that an appellate court can reject the positive testimony of a witness only when that testimony is "inherently improbable". It is not sufficient that the testimony may disclose circumstances which are unusual. Where the testimony is such that within the knowledge of reasonable men it cannot be true the appellate court might assume that knowledge and hold the testimony legally insufficient, but to do so the court must act on what is equivalent to judicial notice. We are not advised of any precedent which would sanction our taking judicial knowledge of the extent of the acquaintance which must be had with the modern bootlegger before he could be asked to pay for protection. All the appellants devote much time and space in their attacks upon the credibility of the witness Smith, and lest they feel that their arguments have gone unnoticed let it be said here that the appellate court does not sit as a jury to determine the issues of fact upon the credibility of the testimony of the witnesses but, when the attack is made on these grounds, it is necessary for the appellant to go further and show that the testimony which we are asked to reject is inherently improbable or that it was incompetent, or for some other reason, not legal evidence upon which the jury could rely.

█ The appellant Collier argues that the evidence was insufficient to prove an overt act. Ten overt acts are alleged in the indictment. Number 1 is merely a repetition of the acts leading to the formation of the conspiracy. Number 2 covers the same matters alleged in count three of the indictment which was dismissed. Numbers 4 and 9 cover the same matters alleged in counts two and four of

the indictment upon which the appellants were acquitted. The remaining charges covered specific acts of bribery similar to those alleged in counts two and four but involving different bootleggers. From the fact that count three was dismissed and from the fact that the jury acquitted on counts two and four it is argued that it is not unreasonable to say that "had the prosecution seen fit to mold each of these overt acts (3, 5, 6, 7, 8 and 19) into separate charges of bribery as they did with three of them, the jury would have acquitted the defendants on them also". This is a conjecture in which we are not permitted to indulge. Counts two and four were specific charges of bribery. Evidence of the bribery came from the testimony of Smith who was an accomplice. Hence, his testimony on the specific act of bribery required corroboration. But, on the first count for conspiracy, it was not necessary that the testimony of the accomplice be corroborated in every particular. Thus the jury may have been satisfied with the testimony of Smith on some one of the overt acts, other than Numbers 2, 4 and 9, and may not have been satisfied that this testimony was corroborated on the specific acts alleged in counts two, three and four. The acquittal of appellants on these two counts can mean nothing more than that the jury did not believe the evidence sufficient to convict, but such acquittal can have no bearing upon the other matters alleged, and we must assume in support of the verdict that the jury found them guilty of one of the alleged overt acts, and that is all that is needed.

The heavy attack of all the appellants is based on the common ground that the evidence of corroboration is insufficient. In these attacks the appellants find much comfort in the recent decisions of the appellate courts, particularly *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32] , *People* v. *Washburn,* 104 Cal. App. 662 [286 Pac. 711] , and *People* v. *Sheffield,* 108 Cal. App. 721 [293 Pac. 72]. All three decisions involved prosecutions of public officials for bribery in the performance of their public duties and all three reversed the convictions. In each the appellate court ruled that the corroborating evidence was insufficient, but it will be noted that, in each case, errors at law occurred during the trial which the court rendering the decision held to have been prejudicial. It would be merely voicing the com-

mon complaint of the bar at large to say that the decisions upon this important subject are in hopeless conflict and confusion, and this is so because the courts are asked to determine each case upon the peculiar facts and circumstances in the record. There is no hard-and-fast rule by which it can be determined what evidence is sufficient and what is insufficient when the appellate court approaches the subject as a trier of fact in the place and stead of the jury. The code section is plain, section 1111 of the Penal Code provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." In *People* v. *Davis, supra,* the Supreme Court pointed out that the rule had always been adhered to that "the corroborating evidence must do more than raise even a grave suspicion of defendant's guilt" and *People* v. *Kempley,* 205 Cal. 441 [271 Pac. 478], and other authorities were cited. Of course, evidence which merely creates a suspicion would not be sufficient else the provisions of section 1111 would be meaningless, and, though we find many "negative" authorities on what is insufficient under the section, it is difficult to find the authorities which declare what is sufficient. *People* v. *Negra,* 208 Cal. 64, 69 [280 Pac. 354, 356], comes closest to the line where it is said: "And if there is other evidence which measures up to the requirement of the code (*supra*), tending to connect the defendant with the commission of the crime charged, then such testimony of the accomplice is to be considered by the jury, as is any other testimony, and must be given the weight to which the jurors may conclude that it is entitled. (*People* v. *Hoosier,* 24 Cal. App. 746 [142 Pac. 514].) The evidence tending to connect a defendant with the commission of the crime may be slight and, when standing by itself, entitled to but little consideration. (*People* v. *McLean,* 84 Cal. 480 [24 Pac. 32].) The law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative testimony is not necessary to support a judgment of conviction founded on the testimony of an accomplice. Even

though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. (*People* v. *Martin,* 19 Cal. App. 295 [125 Pac. 919].) The defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. (*People* v. *Armstrong,* 114 Cal. 570 [46 Pac. 611] ; *People* v. *Sullivan,* 144 Cal. 471, 473 [77 Pac. 1000].) It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged.''

The foregoing quotation was quoted with approval by the Supreme Court in *People* v. *Davis, supra,* with the explanation that it was not intended to hold that the corroborating evidence was sufficient if it merely raises a suspicion of defendant's guilt. But, though evidence which merely creates a suspicion is insufficient because of the statutory presumption of innocence of crime, we must not overlook the weight of an inference which is ''a deduction which the reason of the jury makes from the facts proved'' (Code Civ. Proc., sec. 1958). Hence, when the question of the sufficiency of the corroborating evidence is before the appellate court we cannot approach it in the same manner the jury would do, but we must assume that the jury drew all inferences from the facts proved as ''the reason of the jury'' might sanction. If, therefore, facts are in evidence which would reasonably support an inference that defendant was involved in the conspiracy alleged and the jury so found it is not the province of the appellate court to weigh the evidence or to determine in its mind what weight it would give to such evidence.

The code section expressly states that the corroborating evidence ''shall tend to connect the defendant with the commission of the offense''. This does not mean that such evidence shall connect the defendant beyond all reasonable doubt. Such is the rule of *People* v. *Martin,* 19 Cal. App. 295, 301 [125 Pac. 919), which is quoted with approval in *People* v. *Negra, supra.* ■ Therefore, unless the appellate court can say that the corroborating evidence is either incompetent or is, as matter of law, of such a character that it could not tend to connect defendant with the com-

mission of the offense and could not reasonably support an inference of such connection, the finding of the jury on that issue should not be disturbed.

With this in view and bearing in mind that the alleged conspiracy consisted of the agreement to solicit bribes in consideration for the advancing of information of proposed raids so that the bribe givers might avoid arrest for violations of the law, we may examine the evidence of acts and declarations of the alleged conspirators to see if any of this evidence would *tend* to connect the appellants with the conspiracy.

■ Addressing ourselves to the appeals of Collier and Davis, and referring to the issue of corroboration of accomplice Smith, we find in the evidence that these two appellants throughout the period of the alleged conspiracy called at Smith's home upon an average of twice a week and that frequently upon these calls they each received from Smith an envelope which Smith testified contained money received from bootleggers according to their prior agreement and which these appellants testified contained diagrams of stills operating in the county; that Mrs. Smith testified that on several occasions she saw her husband assorting money and placing it in separate envelopes immediately before Collier and Davis called, and that on one occasion she saw her husband deliver an envelope to each of these appellants; the witnesses Van Noy and Trevett testified that they saw Smith assorting money upon his library table and placing it in separate envelopes a short time before Collier and Davis called, and that Smith, Collier and Davis then went into a bedroom where they remained for five or ten minutes. The only explanation of these transactions given by the appellants was that upon those occasions Smith gave them diagrams of stills, but they gave no explanation why a separate envelope should be given to each while both were working together or why they had not at any time during this entire period of six months delivered any of this information to their superior officers but had on each occasion destroyed the location maps which they testified Smith had given them nor did they explain why during this entire period no still had been raided by them and no arrests made as a result of this information. By their denial that they had received any money from Smith on any of these

occasions the case differs from *People* v. *Davis, supra,* where the court held that the testimony that money had been seen to pass through the hands of the accomplice was insufficient to corroborate his testimony because it should be presumed that the money was delivered for a legitimate rather than for a criminal purpose. From the weak and unsatisfactory explanations of these appellants as to the contents of the envelopes the jury was warranted in inferring that money did pass as Smith and his wife testified, and this inference would corroborate the testimony of Smith in that respect. Then bearing in mind that the theory of the prosecution was that the object of the conspiracy was that the conspirators would either fail to arrest or would give to the bribe givers advanced information of proposed raids so that all criminal evidence could be destroyed we find the testimony of Mrs. Walker to the effect that habitually before these appellants started on a raid with a search-warrant procured by the district attorney's office, Collier and Davis would lag behind the other officers and the latter would put in a telephone call which was usually " 'make it at 7 o'clock'; 'it will be now' or the like". This information was generally conveyed to Smith who in turn relayed it to the party to be raided and his testimony that he received and conveyed this information was corroborated by other evidence. The explanation of the appellants of this testimony is nothing more than a complete denial, and here again the trial jury was called upon to weigh the evidence and if the jury believed the testimony of Mrs. Walker and these other witnesses and disbelieved the testimony of the appellants in this respect it follows, of course, that Smith's testimony of these transactions was fully corroborated. Aside from the testimony relating to what happened in the sheriff's office as to "tip offs" of these raids we find the direct evidence coming from Mrs. Smith that in the latter part of July she received a telephone call from Davis asking if her husband was in, and that upon being informed that he was not, Davis asked her to get in touch with her husband and tell him to telephone the Irvington Hotel and warn them to close up as the place was to be raided that night. It is also in the evidence that Mrs. Smith got in touch with her husband and he informed her that he could not telephone the hotel from where he was located, asked

her to do so, that she did phone the hotel and that on the same night the place was raided and no evidence of the sale or possession of liquor found. It is also in evidence, coming from the testimony of Collier and Davis, that during this period they made numerous raids upon bootlegging establishments in the eastern portion of Alameda County, and that in ninety per cent of such raids they found liquor and made arrests. It is significant, however, that during the entire period of the alleged conspiracy none of the bootleggers named by Smith as having paid for protection was raided excepting in one instance in which a federal raid was made against Schenone and another when a federal raid was made against Gardella, at which time he had been given advanced information and had destroyed all evidence of the sale or possession of liquor. In addition to this, there is the testimony of Pisani and Santucci of their conversations with Ormsby, an attorney at law, who urged the witnesses to construct and operate a still and assured them in the presence of Davis that they would be fully protected from the sheriff's office by the payment of a monthly sum for that purpose, and the testimony of Pisani as to the association of Collier with Ormsby in this enterprise. And then we find the undisputed evidence of the association of Collier and Davis with Smith and Ormsby throughout this entire period; their frequent gatherings with their respective families in bootlegging establishments where liquor was being drunk, these places all being on Smith's list of the protected. Aside from this direct evidence (which is but a small portion of the corroborating testimony relied upon by the state) the respondent urges the circumstance that when Collier and Davis were called before the grand jury when it was making its investigation of the alleged conspiracy both were informed of the accusations made against them by Smith and neither denied the accusations but both refused to testify upon the ground that their testimony might tend to incriminate them. The foregoing statement of the evidence is sufficient to corroborate the testimony of Smith as to the formation of the alleged conspiracy, and is such "as shall tend to connect the defendant with the commission of the offense", and it is unnecessary to outline the mass of other evidence which was offered for this purpose.

 It is strenuously argued by the appellants that we may not take the testimony of Mrs. Smith as corroborative of that of her husband because in relaying the "tip off" message to the Irvington Hotel she became an accomplice, but to hold her as an accomplice it would be necessary to hold that she was a party to the offense charged, which was a conspiracy to ask and receive bribes for certain purposes. But it does not appear that she had any knowledge of the conspiracy nor any knowledge of the relations between the conspirators or the proprietor of the Irvington Hotel. Her action in conveying the message to the hotel upon the request of her husband was consistent with an innocent obedience of her husband's commands, and though it is possible that the entire evidence may have been sufficient to warrant the jury in inferring an evil motive on the part of Mrs. Smith, such motive was certainly not presumed, and, therefore, the question of whether she was an accomplice was a fact to be left to the jury and not a question of law to be determined by the trial judge. In this connection the appellants attack the refusal of the trial judge to give their proposed instruction advising the jury that it must consider Mrs. Smith as an accomplice, and likewise attack the instructions which the trial judge gave to the jury defining an accomplice and advising the jury what was sufficient corroborative evidence of the testimony of an accomplice. There was no error in either respect. (*People* v. *Ward,* 134 Cal. 301, 311 [66 Pac. 372]; *People* v. *Lawlor,* 21 Cal. App. 63, 68 [131 Pac. 63].)

 The appellant Collier criticises the action of the trial court in admitting the testimony of Smith relating to conversations had with Smith, Davis and Gardella in the absence of Collier. This testimony all related to matters occurring after the formation of the conspiracy and was clearly admissible under section 1870 of the Code of Civil Procedure, as interpreted in the cases heretofore cited. Smith's testimony relating to his conversations with Valponi, Croce, Peyser, Schenone and others who were maintaining bootlegging establishments were all evidence of the transactions of a co-conspirator in furtherance of the purposes of the conspiracy, and this testimony of Smith, like his testimony relating to the payments made by various bootleggers and his division of the proceeds among his co-conspirators, was

234

properly admitted. ■ Likewise there was no error in admitting the testimony of Van Noy, Trevett and Mrs. Smith relating to Smith's division of the money in his home prior to the visits of Collier and Davis, because this was evidence of ''an act'' of one of the conspirators performed after the formation of the conspiracy.

■ Considerable space is devoted to an attack upon the admission of the testimony of Pisani regarding his promise to pay to Ormsby $3,000 a month for protection in the operation of an illicit still, such protection being assured him by Ormsby in the presence of Davis. Of a similar character are the objections to the testimony of Tognotti, Santucci and Roggi. The objections are two: That these transactions were not had in the presence of all the other alleged conspirators, and that they were evidence of separate and distinct offenses. The first objection is without merit as we have already said. ■ As to the second objection the rule seems to be fully settled. In *People* v. *Arnold,* 199 Cal. 471 [250 Pac. 168], the Supreme Court, quoting from *People* v. *Wilson,* 76 Cal. App. 688 [245 Pac. 781], said: '' 'In such cases it is no objection that the evidence covers a great many transactions and extends over a long period of time, or that it may show the commission of other crimes. When the question is whether the accused was a party to a general conspiracy, distinct overt acts in furtherance of such a design may be given in evidence. (*People* v. *Collins,* 64 Cal. 293 [30 Pac. 847]; *People* v. *Berry,* 191 Cal. 109, 122 [215 Pac. 74]; *Commonwealth* v. *Scott,* 123 Mass. 222 [25 Am. Rep. 81]; *Hall* v. *State,* 3 Lea (Tenn.), 522.) See, also, *Commonwealth* v. *Stuart,* 207 Mass. 563 [93 N. E. 825], *State* v. *Roberts,* 95 Kan. 280 [147 Pac. 828], *Jenkins* v. *Commonwealth,* 167 Ky. 544 [3 A. L. R. 1522, 180 S. W. 961], and *Worden* v. *United States,* 204 Fed. 1 [122 C. C. A. 315],' '' and in the same decision, quoting from *Commonwealth* v. *Scott,* 123 Mass. 222 [25 Am. Rep. 81], the court said: '' 'There being evidence sufficient to be laid before the jury to prove the conspiracy, as to which the presiding justice was in the first instance to determine, it was competent for the government to put in evidence any acts of the several conspirators in furtherance of the common purpose of the conspiracy, either before or after the robbery was completed.' '' And in *People* v.

*Schmidt*, 33 Cal. App. 426, 445 [165 Pac. 555, 563], the District Court, quoting from *People* v. *Olsen*, 80 Cal. 122 [22 Pac. 125], said: " 'Where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. . . . Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the common design for which they combined.' " The court added as authorities for the rule, *People* v. *Kauffman*, 152 Cal. 331 [92 Pac. 861] ; *People* v. *Creeks*, 170 Cal. 368, 369 [149 Pac. 821] ; *Spies* v. *People* (*The Anarchists' Case*), 122 Ill. 1 [3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898].

▆ The testimony of similar transactions occurring in the latter part of August and in early September of the year 1927 was not inadmissible under the rule excluding acts and declarations of a co-conspirator after the *completion* of the conspiracy. The indictment alleged the period of time of the conspiracy as from February 1, 1927, to August 20, 1927, but this was merely an approximation and was not a definite time limiting the period of the conspiracy. There was no evidence that the conspiracy ended precisely on August 20th, and, from the nature of the case, this was not such a conspiracy as would be "completed" by a definite overt act such as murder or robbery. Hence, evidence of transactions occurring within a few weeks following August 20th was not evidence of a separate isolated act or declaration of one of the conspirators occurring subsequent to the end or the "objective" of the conspiracy, within the rule of *People* v. *Oldham*, 111 Cal. 648 [44 Pac. 312], and similar cases. To the contrary these acts and declarations were shown to have been "the ordinary and probable effect of the common design" of the conspirators, and evidence of such was admissible under the rule noted in *People* v. *Lorraine*, 90 Cal. App. 317, 327 [265 Pac. 893, 897], where the court say: "The common design of a criminal enterprise may extend, however, as appellant concedes, beyond the point of the commission of the act constituting the crime for which the alleged conspirator is on trial (*People* v. *Opie*, 123 Cal.

294 [55 Pac. 989]; *People* v. *Mazzurco*, 49 Cal. App. 275 [193 Pac. 164]; *People* v. *Holmes*, 118 Cal. 444 [50 Pac. 675]; *People* v. *Rodley*, 131 Cal. 240 [63 Pac. 351]); and, as declared in California Jurisprudence (vol. 5, p. 523)." To the same effect is *People* v. *Sampsell*, 104 Cal. App. 431 [286 Pac. 434].

The application of the rule in the present case is that it was always the theory of the prosecution that the alleged conspirators were operating in the eastern section of Alameda County as a portion of a county-wide conspiracy headed by the sheriff of the county and involving many of his deputies and others officially connected with his office for the general purpose of collecting tribute from all those engaged in any unlawful business conducted in the county. Thus having proved the conspiracy alleged in the indictment it was competent for the state to offer in corroboration thereof the activities of Davis, Collier, Smith and others as evidence of the ordinary and probable effect of the common design of the conspiracy alleged.

The question involved here is not whether this testimony was competent because the general rule is that evidence of the separate acts and declarations of one co-conspirator is admissible against all the other conspirators after the conspiracy has been established because each is criminally responsible for the acts of his confederates committed in furtherance of the common design. (*People* v. *Kauffman*, 152 Cal. 331, 334 [92 Pac. 861]; *People* v. *Creeks*, 170 Cal. 368, 374 [149 Pac. 821].) But the real question involved in the point raised by this appellant is whether this testimony was relevant. The question of the relevancy of testimony is frequently confused with the question of the weight and sufficiency of that testimony to prove a particular issue. Evidence is relevant when no matter how weak it may be it tends to prove the issue before the jury. In *Moody* v. *Peirano*, 4 Cal. App. 411, 418 [88 Pac. 380, 382], it was said: "The tendency of modern decisions is to admit any evidence which may have a tendency to illustrate or throw any light on the transaction in controversy, or give any weight in determining the issue, leaving the strength of such tendency or the amount of such weight to be determined by the jury; and in determining the relevancy of evidence that may be offered upon an issue of fact

much depends upon the nature of the issue to sustain which or against which it is offered, and a wide discretion is left to the trial judge in determining whether it is admissible or not.'' It has frequently been said that ''it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts bearing more or less closely or remotely upon the common design'' (*People* v. *Sampsell*, 104 Cal. App. 431 [286 Pac. 434, 437]), and for this reason greater liberality is permitted in the admission of circumstancial evidence which would tend to prove the fact of the conspiracy, as well as that which would tend to corroborate the testimony of a co-conspirator. Hence, any testimony which is relevant for these purposes and which is not too remote or incompetent should be received and the weight and sufficiency of the evidence should be left to the triers of the questions of fact. ▆▆▆ Accordingly, when the question of the common design of a criminal enterprise and the question whether that common design extended beyond the point of time of the actual commission of the act constituting the overt act alleged are matters in issue those questions are to be determined by the jury and any competent evidence which tends to prove the extent of the conspiracy and any competent evidence of acts or declarations tending to prove this common design is relevant to the issues before the jury. Such evidence even though it may tend to prove the commission of distinct criminal acts is not admitted under the rule permitting evidence of similar criminal acts but is admitted under the circumstances above stated for the purpose of proving the common design and extent of the conspiracy alleged. (*People* v. *Schmidt*, 33 Cal. App. 426 [165 Pac. 555]; *People* v. *Lorraine*, 90 Cal. App. 317 [265 Pac. 893]; *People* v. *Sampsell*, 104 Cal. App. 431 [286 Pac. 434].)

▆▆▆ Objection is made to the admission of evidence relating to transactions between Smith and Sheriff Becker, Parker and Davis after Smith had fled to Los Angeles. This testimony was presumably offered for the purpose of corroborating Smith's testimony as to his criminal association with the sheriff's office of Alameda County. It was all stricken out and the jury was instructed to disregard it. There was nothing in this testimony that was prejudicial to

any of the appellants except as to appellant Davis, and as to him it was properly admitted. If any error occurred as to the other appellants through the admission of this testimony that error was cured by the order striking out the instruction to the jury to disregard it. Though the appellant Collier insists that the evidence was improperly admitted he does not show in what respect it was in any way prejudicial to him. This is not a case such as *People* v. *Anthony*, 185 Cal. 152 [196 Pac. 47], and similar cases, where the testimony admitted was such that it poisoned the minds of the jury to such an extent that the error could not be cured.

These two appellants complain of the ruling permitting the evidence in rebuttal of the witness Barnes. Appellant Collier on cross-examination had been asked if he had been served intoxicating liquor in the Newark Hotel during the period of the alleged conspiracy, and answered, no. Barnes, who was a cook at the Newark, testified that both Collier and Davis had been served drinks in the hotel during that time and that, on the occasions when they raided the place, the proprietor removed the liquor and slot-machine a short time before the raid occurred. The appellants insist that the impeachment was on a collateral matter. But it was not. The evidence disclosed that these two deputies, whose special duty it was to make arrests of those engaged in the illegal sale of liquor, frequented one of the bootlegging establishments which the witness Smith testified was on his list and that no arrests were made though violations of the law were known to these deputies. This testimony tended to corroborate the witness Smith and was relevant to that issue.

In so far as the appellants Collier and Davis are concerned we find no error in the record and the judgment and order as to them should be affirmed.

Little need be said regarding the case of appellant Gardella, inasmuch as the case must be reversed as to him because of the lack of corroborating evidence and the general principles and the questions of law which will arise on a retrial are not different from the general principles which have heretofore been discussed. In support of the judgment the respondent cites as corroborating evidence the testimony of Pauline Walker that Gardella was frequently in and about the sheriff's office, having conversations with

Collier, Davis and Sheriff Becker, and that on one occasion she telephoned him asking him why he had a truck-load of liquor in front of his place, and that he told her not to worry because he was paying plenty of protection to the sheriff's office. The respondent cites as further corroborating testimony, this appellant's admission that he was raided by Collier and Stark of the sheriff's office but had received advanced information and had consequently destroyed all evidence; his testimony that Smith had tried to persuade him to buy stock in a paving company which was being organized by Parker who was a friend and associate of the sheriff; and the testimony of Mrs. Smith that she and her husband, in company with Becker and Parker and their respective wives, had been entertained by Gardella at which time intoxicating liquor was served. We are unable to find in this testimony any evidence which measures up to the requirements of the cases heretofore discussed, or that the testimony does more than create a suspicion of guilt of this appellant. For this reason the judgment and order as to him must be reversed.

For the reasons given it is ordered that the judgment and order in so far as they relate to appellants Collier and Davis are affirmed, and in so far as they relate to the appellants Shurtleff and Gardella, they are reversed with directions for a new trial.

Sturtevant, J., and Burroughs, J., *pro tem.*, concurred.

Petitions for a rehearing of this cause were granted by the District Court of Appeal on February 4, 1931, as to defendant Shurtleff, and denied as to the other defendant, and the following opinion then rendered thereon:

THE COURT.—In his petition for a rehearing the appellant Collier finds fault with that portion of the opinion which relates to the admission in evidence of the testimony of the accomplice Smith relating to the acts and conversations of his co-conspirators leading to the formation of the conspiracy. He argues that what we have said in the opinion is contrary to the rule of *People* v. *Irwin,* 77 Cal. 494 [20 Pac. 56]; *People* v. *Doble,* 203 Cal. 510 [265 Pac. 184], and other cases cited. In our original opinion we en-

deavored to point out the distinction between the cases cited and the case at hand, and for the purpose of making our position more clear it is now ordered that the concluding sentence on page 6 [295 Pac. 901] of the typewritten opinion reading as follows: "Reading these sections together it seems clear that the purpose of the statute is that the act or declaration of a party could not be received in evidence as proof of a conspiracy with others until such conspiracy was established but that, when the matter at issue is the formation of the conspiracy, or the purposes for which the combination was made, evidence of the acts and declarations of the coconspirators among themselves and in their presence is admissible for the purpose of proving that issue" is hereby stricken out and the following is inserted in lieu thereof: "The offense charged in the indictment was that the defendants combined and agreed together, and with each other, to commit the crime of asking, receiving and 'agreeing to receive a bribe' in violation of section 68, Penal Code." This section declares the crime to be when an executive officer "asks, receives, or agrees to receive, any bribe, *upon an agreement or understanding* that his . . . action . . . shall be influenced thereby". Thus the agreement is the essential element of the crime charged as well as that denounced by the statute. This being so the *corpus delicti* of the crime charged was the "agreement or understanding" made by the defendants and Smith whereby one or more of them undertook to ask for bribes, one or more agreed to accept bribes, and the sheriff's deputies undertook upon their part to permit their action as such officers to be influenced thereby.

Now it must be apparent that when an agreement is not in writing parol evidence is admissible to prove its contents. And, when the agreement is in parol, evidence of the conversations of the parties tending to disclose the agreement made is evidence of the very fact to be proved and hence is evidence of the *res gestae*. Hence, when the conspiracy charged in the indictment is an "agreement" to do or not to do a certain act evidence of the conversations and acts of the conspirators which constitute the agreement is admissible to prove the agreement. Thus, when, as a part of the agreement, one or more of the conspirators undertakes to ask for a bribe, one or more

agrees to accept a bribe, one or more agrees to do or not to do some act for the purpose of effectuating the compact, and one or more of the conspirators gives his assent to the compact either by express words or by actions from which such assent might be implied, evidence of such facts, when the agreement is in parol, is competent evidence of the acts or declarations which form "a part of the transaction" which is in dispute, and, as such is admissible under the express provisions of section 1850 of the Code of Civil Procedure. On the other hand, if a witness were asked to relate a conversation which he had had with one of the alleged conspirators such testimony would be hearsay and would not be admissible under section 1870, subdivision 6 of the Code of Civil Procedure, until after the conspiracy had been proved, and, by thus permitting evidence of the acts and declarations of a conspirator against his co-conspirator, this subdivision becomes an enlargement of rather than a limitation upon the ordinary hearsay rule.